## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GULF PACKAGING, INC.,[1] | ) | Case No. 15-15249 |
| | ) | |
| Debtor. | ) | Honorable Pamela S. Hollis |
| | ) | |
| | ) | **Hearing Date:**  **May 5, 2015** |
| | ) | **Hearing Time:**  **10:00 a.m.** |
| | ) | **Courtroom:**  **644** |
| | ) | |

### NOTICE OF MOTION

PLEASE TAKE NOTICE that on **Tuesday, May 5, 2015 at 10:00 a.m.**, or as soon thereafter as counsel may be heard, we shall appear before the Honorable Pamela S. Hollis in the courtroom usually occupied by her, No. 644, in the Dirksen Federal Building at 219 South Dearborn Street, Chicago, Illinois, or whomever may be sitting in her place and stead, and then and there present the **DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE USING ITS CASH MANAGEMENT SYSTEM, (B) MAINTAIN ITS EXISTING BANK ACCOUNTS AND BUSINESS FORMS, AND (C) CONTINUE TRANSACTIONS WITH AFFILIATES, AND (II) GRANTING RELATED RELIEF**, a copy of which is attached hereto and hereby served upon you, at which time and place you may appear.

---

[1] The last four digits of the Debtor's tax identification number are 5030.

GULF PACKAGING, INC.

By:_____/s/ Joseph D., Frank_____
Joseph D. Frank (IL ARDC 6216085)
Jeremy C. Kleinman (IL ARDC 6270080)
**FRANKGECKER, LLP**
325 North LaSalle Street, Suite 625
Chicago, Illinois 60654
Telephone: (312) 276-1400
Facsimile: (312) 276-0035
Email:  jfrank@fgllp.com
        jkleinman@fgllp.com

-and-

**GRAY REED & MCGRAW, P.C.**
Jason S. Brookner (*pro hac vice* pending)
Micheal W. Bishop (*pro hac vice* pending)
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:  jbrookner@grayreed.com
        mbishop@grayreed.com

**PROPOSED COUNSEL TO THE DEBTOR**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GULF PACKAGING, INC.,[1] | ) | Case No. 15- 15249 (PSH) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE USING ITS CASH MANAGEMENT SYSTEM, (B) MAINTAIN ITS EXISTING BANK ACCOUNTS AND BUSINESS FORMS AND (C) CONTINUE TRANSACTIONS WITH AFFILIATES, AND (II) GRANTING RELATED RELIEF

Gulf Packaging, Inc., the above-captioned debtor and debtor in possession (the "Debtor," "GPI" or the "Company"), for its Motion (the "Motion") For Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Using Its Cash Management System (the "Cash Management System"), (B) Maintain Its Existing Bank Accounts and Business Forms and (C) Continue Transactions with Affiliates (the "Affiliate Transactions"), and (II) Granting Related Relief, respectfully represents:

### JURISDICTION AND VENUE

1.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### INTRODUCTION

3.     On this date (the "Petition Date"), the Debtor filed with this Court its petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is operating its business and managing its properties as debtor in possession pursuant to

---

[1] The last four digits of the Debtor's tax identification number are 5030.

sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No request has been made for the appointment of a trustee or examiner, and no statutory committee has yet been appointed.

## BACKGROUND

5.      GPI is a national distributor of packaging equipment and supplies, which sells its product by and through several independent entities ("Affiliates").[2]  The Affiliates are Gulf Arizona Packaging Corporation, Carolina-Gulf Packaging, LLC, Florida Gulf Properties, LLC, Gulf Packaging–Sacramento, LLC, Gulf Systems, Inc. ("GSI"), Gulf-Pacific Packaging Corporation, and Gulf-Great Lakes Packaging Corporation. Each of these Affiliates is also a guarantor under GPI's credit facility with FCC, LLC d/b/a First Capital ("FCC").  When GPI is combined with the Affiliates, there are over twenty (20) warehousing locations to better serve GPI's customer base.

6.      For the majority of GPI's business,[3] either ADP Total Source ("ADP") or the Affiliates employ the salespersons who generate sales to customers.  Customers issue purchase orders to GPI through one of the Affiliates, and GPI then issues a purchase order to its own trade vendors, thereby creating an account payable for GPI.  GPI has the obligation to pay for the purchase and delivery of the goods in question, which are delivered to the customers.  GPI creates an account receivable with the customer in the name of GPI with remittance by the

---

[2] As used herein, "Affiliate" means a company that has a relationship – formal or informal -- to the Debtor, and sells packaging products under a variation of the Gulf name.  Unless otherwise set forth, use of the term "Affiliate" is not intended to have the same meaning as the "affiliate" term of art defined in section 101(2) of the Bankruptcy Code. All rights with respect to this issue are reserved.

[3] In addition to the standard sale of packaging products and supplies as described herein, GPI sells packaging equipment (that is, equipment used to package products).  On occasion GPI may lease equipment to a customer with a buyout option at the end of the term.  In other instances, GPI may provide a piece of equipment free of charge in exchange for the customer purchasing consumable products, with which the equipment is used, from GPI.  In this scenario, the equipment remains the property of GPI.  Finally, GPI also has consignment arrangements with certain of its customers.  In these instances, GPI keeps its inventory on the customer's floor and reconciles once per month. GPI bills the customer for the monthly usage and then replenishes the stock back to appropriate levels.

2

customer to be made for the benefit of GPI to a Key Bank lock box account owned and controlled by FCC. On occasion, a customer may pay an Affiliate rather than GPI. In those instances, the funds are sent to GPI by the Affiliate, and then transferred to the lock box account at Key Bank.

7.      Generally speaking, there is a 20% gross profit margin on each sale made by GPI. Typically, GPI and the Affiliates split that margin evenly, to enable the Affiliates to cover direct selling costs and commissions owed to salespeople.  The share to GPI is then used to reimburse the Affiliates for their operating costs relative to their sales and marketing operations, and to pay GPI's operating costs. The costs reimbursed to the Affiliates include payroll, freight, utilities, warehousing and other routine operating costs. The costs borne by GPI include payroll and employee benefits, rent and other facilities costs, and infrastructure-related costs, such as I.T. services.

8.      In addition, Merchants and Manufacturers Bank ("MMB") is lender to GPI for various equipment financings. These loans are secured by first-priority liens on the underlying equipment or machinery being financed. Some of this equipment is situated at GPI's facilities, while some has been provided to GPI's customers. In some cases, a portion of the customer's accounts payable to GPI includes payment for the financed equipment on their premises, which funds are remitted to MMB upon receipt. Otherwise, GPI pays MMB for these financings in the ordinary course of business. Both MMB and FCC are parties to an inter-creditor agreement that sets out the rights and obligations of each to the other.

9.      Additional information about the Debtor, its business and corporate and capital structures is set forth in the *Declaration of Edward T. Gavin, CTP in Support of Chapter 11 Petition and First Day Pleadings* (the "Gavin Declaration") filed on the Petition Date.

## THE DEBTOR'S CASH MANAGEMENT SYSTEM

10.     The Debtor maintains and directs an integrated Cash Management System as part of the ordinary course of its business that allows it to efficiently collect, transfer, and disburse funds generated by its operations. The Cash Management System is vital to the Debtor's ability to its conduct business across the United States. Indeed, the integrated Cash Management System helps control funds, serves as a repository for cash receipts, manages cash disbursements, ensures cash availability, and reduces administrative expenses by facilitating the movement of funds among multiple entities by generally centralizing cash operations from a central location. The Cash Management System generally is similar to those commonly employed by complex businesses comparable to that of the Debtor.

11.     As described herein, given the economic and operational scale of the Debtor's operations, any disruption to the Cash Management System would have an immediate adverse effect on the Debtor's business and operations to the detriment of its estate and numerous stakeholders. Accordingly, to minimize the disruption caused by this chapter 11 case and to maximize the value of the Debtor's estate, the Debtor requests authority to continue to utilize its existing Cash Management System during the pendency of this chapter 11 case, subject to the terms described herein.

I.     **Description of the Cash Management System**

A.     **The Bank Accounts**

12.     The Cash Management System consists of five (5) operating bank accounts (collectively, the "Bank Accounts") maintained by the Debtor at MMB and one lock box account maintained by and in the name of FCC at Key Bank (collectively, the "Banks"). As discussed more fully below, none of the Bank Accounts are maintained with banks designated as

4

authorized depositories by the Office of the United States Trustee for the Northern District of

Illinois, Eastern Division (the "U.S. Trustee"), pursuant to the U.S. Trustee's Operating

Guidelines and Financial Reporting Requirements for Debtors-in-Possession and Trustees (the

"U.S. Trustee Guidelines"). A schedule of the Bank Accounts, the name of the Bank at which the

account is maintained, and the last four digits of the account number is attached hereto as

**Exhibit A**, and is incorporated herein by reference.[4]

13.    Generally, and as more fully described below, the Bank Accounts are organized

as follows:

(a)    The Lock Box Account (Key).  Although not owned by the Debtor, the Lock Box Account plays a critical role in the cash flow of the Cash Management System. The Lock Box Account is in the name of "FCC Financing Subsidiary III, LLC fbo Gulf Packaging, Inc."

(b)    The Advance Account (MMB).  The Advance Account was established by Debtor to receive the daily draws made by the Debtor under the FCC Facility.

(c)    The Collection Account (MMB).  The Collection Account was established by Debtor to receive any deposits from the Debtor's customers collected directly by the Affiliates. Upon deposit, the collections are transferred to the Lock Box Account.

(d)    Operating Account No. 1 (MMB).  Operating Account No. 1 is the Debtor's primary operating account.

(e)    Operating Account No. 2 (MMB).  Operating Account No. 2 is used primarily to make wire transfers to other accounts maintained by the Debtor and the Affiliates. Operating Account No. 2 is currently dormant.

(f)    Payroll Account (MMB).  The Payroll Account is used by the Debtor to pay its payroll.

---

[4] Because the Key Bank lock box account is an FCC account and not a Debtor account, it is not *per se* subject to the U.S. Trustee Guidelines or this Motion. Out of an abundance of caution, however, Key Bank and the lock box account have been included herein, to ensure that the Cash Management System as a whole remains intact.

2604487.6

**B.**   **Affiliate Bank Accounts**

14.   As more fully described above and in the Gavin Declaration, the Debtor sells its product by and through several independent Affiliates.  The bank accounts maintained by the Affiliates are not in, or part of, the Cash Management System.

**C.**   **The Flow of Funds within the Cash Management System**

15.   The funds flow diagram, which is attached hereto as **Exhibit B** and incorporated herein by reference (the "Funds Flow Diagram"), sets forth the flow of funds among the Bank Accounts. As set forth in the Funds Flow Diagram, the Cash Management System has three main components: (a) receipt of funds, (b) cash concentration, and (c) cash disbursements to fund the Debtor's operations. Each of these components is described below in turn.

**1.**   **Receipts/Collections**

16.   Sales orders are processed by staff at the Affiliates in the name of the Debtor. Pursuant to agreements with FCC, the majority of the Debtor's revenues generated by these sales orders flow directly into the Lock Box Account. The Debtor also has some credit card sales and such credit card receipts are directly sent to the Lock Box Account. A relatively small amount of accounts receivable, however, are collected directly by the Affiliates. Typically, Affiliates receive these funds in the form of a check, which are then endorsed over to the Debtor and deposited into the Collection Account and transferred to the Lock Box Account.

**2.**   **Cash Concentration**

17.   The Debtor makes daily draw requests on the FCC Facility. Once approved, FCC transfers the requested amount to the Advance Account. The Debtor then transfers funds from the Advance Account to its operating and payroll accounts, as well as accounts maintained by the Affiliates, as appropriate and pursuant to the Debtor's normal and customary business practices.

6

### 3.   Cash Disbursements

18.    Funds from the Advance Account are transferred into (i) Operating Account No. 1 to pay trade payables, and (ii) the Payroll Account to make payroll.  The Debtor also uses the funds in Operating Account No. 1 to reimburse the Affiliates for their payroll costs, warehousing and other administrative expenses incurred providing services to the Debtor.

## II.    The Cash Management System's Compliance with the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code

19.    As noted above, none of the Bank Accounts are maintained with Banks designated as authorized depositories by the U.S. Trustee; however, the Banks are well-capitalized and each of the Banks (and Bank Accounts) are insured by the Federal Deposit Insurance Corporation. Therefore, the Debtor can maintain all of its Bank Accounts without jeopardizing any party in interest. Moreover, each of the Banks is a necessary part of the Cash Management System, and any changes in this system could cause significant disruption to the Debtor's operations.

20.    In addition, the Debtor does not invest its cash in any money market or other types of short-term securities. Instead, all cash is kept in the MMB Bank Accounts. The Debtor, therefore, does not believe that any of the MMB Bank Accounts are "investment accounts" as contemplated by section 345(b) of the Bankruptcy Code.

## III.    Affiliate Transactions

21.    As discussed above, the Debtor maintains business relationships with certain Affiliates, resulting in receivables and payables in the ordinary course of business (collectively, the "Affiliate Claims"). In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted among the Debtor and the Affiliates, at any given time there may be Affiliate Claims owing by

7

and between the Debtor and the Affiliates. Most Affiliate Claims are reflected as receivables and payables, as applicable, in the respective Debtor's or Affiliate's accounting systems. Accordingly, the Debtor can, and will be able to ascertain, trace, and account for all Affiliate Transactions, both pre- and post-petition. The Debtor's transactions with the Affiliates generally relate to (i) the Debtor paying the Affiliates' employees' commissions, wages and related payroll taxes and benefits and (ii) reimbursement by the Debtor for certain of the Affiliates' operating expenses. The Debtor transfers funds to the Affiliates and upon receipt, the Affiliates pay their respective payroll and related taxes for their employees. However, the persons performing services at GSI are employees of ADP. Respecting these ADP employees, the Debtor pays ADP for the gross amount of payroll and related taxes and benefits, and ADP in turn pays the employees. Generally, there are no Affiliate Claims on account of the payroll paid by the Debtor.

22.     Unless otherwise authorized by the Court, the Debtor intends to pay only for goods and services provided postpetition by the Affiliates. The Affiliate Transactions described above as well as other Affiliate Transactions are essential aspects of the Debtor's business operations. The Affiliate Transactions are crucial for the Debtor to process payroll and provide support for the Affiliates' operations. Moreover, the Debtor would be unduly burdened, both financially and logistically, if the Debtor was required to halt the Affiliate Transactions at this time, as this is–and has been–the normal course of business operations. The Debtor believes that without the Affiliate Transactions, the Debtor's business and the Cash Management System would be disrupted unnecessarily to the detriment of the Debtor, its creditors, and other stakeholders.

## IV.  Banking Transactions, Bank Fees, and Related Expenses

23.     The Debtor conducts transactions by debit, wire, credit card, automated clearing house ("ACH") payments, and other similar methods, as well as by check. Moreover, a certain percentage of the Debtor's customer receipts are received through wire transfer, credit card payments, and ACH payments. Thus, the Debtor's ability to conduct transactions by debit, wire, ACH payment, or other similar methods is of vital importance to its ability to manage its business; if the Debtor was unable to perform such transactions, it may be unable to perform under certain contracts, its business operations may be unnecessarily disrupted, its estate may incur additional costs, and stakeholder value may be needlessly destroyed.

24.     It is therefore critical that the Banks continue to maintain, service, and administer the Bank Accounts as accounts of the Debtor, as debtor in possession, without interruption and in the ordinary course of business. In this regard, the Banks should be authorized and directed to receive, process, honor, and pay any and all checks, ACH transfers, and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto.

25.     In addition, in the ordinary course of business, the Banks charge, and the Debtor pays, honors, or allows the deduction from the appropriate account, certain service charges and other fees, costs, and expenses (collectively, the "Bank Fees"). Historically, the Debtor estimates that it is charged approximately $2,500.00 in Bank Fees each month, with fluctuations depending upon transaction volume. However, the Debtor does not believe that there are any unpaid Bank Fees as of the Petition Date.

26.     The Cash Management System depends on the ability of the Banks to maintain and administer the Bank Accounts and to honor and process the Debtor's banking transactions.

9

2604487.6

Accordingly, to maintain the integrity of the Cash Management System, it is important that the Banks are able to (a) continue to charge the Debtor the Bank Fees and (b) charge back returned items to the Bank Accounts, whether such items are dated before, on, or after the Petition Date in the ordinary course of business and consistent with prior practice. In addition, it is important that the Debtor is authorized to honor and pay any and all other Bank Fees required by the Cash Management System in the ordinary course of business. For clarity, the Bank Fees shall not include any indebtedness under the FCC Facility.

**V.     Business Forms**

27.     As part of the Cash Management System, the Debtor utilizes numerous preprinted business forms in the ordinary course of its business. The Debtor also maintains books and records to document, among other things, its profits and expenses. Rather than requiring the Debtor to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines, the Debtor is seeking authority to continue using all currently existing correspondence and business forms (including letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtor's status as debtor in possession. This will minimize expenses to the Debtor's estate and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of this chapter 11 case.

**RELIEF REQUESTED**

28.     By this Motion, pursuant to sections 105, 345, 363, 1107, and 1108 of the Bankruptcy Code, Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 5005-3(D) of the Local Bankruptcy Rules for the Northern District of Illinois (the "Local Rules"), GPI seeks entry of interim and final orders:

2604487.6

(a)   authorizing, but not directing, the Debtor to (i) continue to operate its
Cash Management System, (ii) continue to use, with the same account
numbers, all of the Bank Accounts (as defined herein) in its Cash
Management System, (iii) open new debtor in possession accounts, if
needed, and (iv) use its existing correspondence and business forms
(including letterhead, purchase orders, invoices, and preprinted checks)
as such forms were in existence immediately before the Petition Date
(as defined herein), without reference to the Debtor's status as debtor in
possession;

(b)   authorizing, but not directing, the Debtor to continue, in its business
judgment and at its sole discretion, participating in the Affiliate
Transactions. However, unless otherwise authorized by the Court, the
Debtor shall not pay any Affiliate for goods and services provided to the
Debtor pre-petition;

(c)   authorizing and directing the Banks (as defined herein) to (i) continue to
maintain, service, and administer the Bank Accounts as accounts of the
Debtor as debtor in possession and provide related treasury and cash
management services, without interruption and in the ordinary course,
(ii) receive, process, honor, and pay, to the extent of available funds,
any and all checks, drafts, wires, ACH transfers, credit card payments,
other electronic transfers, or other items presented, issued, or drawn on
the Bank Accounts, and (iii) debit or charge back the Bank Accounts for
all undisputed prepetition and postpetition Bank Fees, but Bank Fees
shall not include any indebtedness under the FCC Facility; and

(d)   granting related relief.

29.    In addition, the Debtor requests that the Court schedule a final hearing within
approximately 25 days of the commencement of this chapter 11 proceeding to consider approval
of this Motion on a final basis.

I.   **The Court Should Approve the Debtor's Continued Use of the Cash Management
System Because It Is Essential to the Debtor's Operations and Restructuring Efforts**

30.    The U.S. Trustee Guidelines require debtors in possession to, among other things:
(a) establish one debtor in possession bank account for all estate monies required for the payment
of taxes, including payroll taxes; (b) close all existing bank accounts and open new debtor in
possession accounts; (c) maintain a separate debtor in possession account for cash collateral; and
(d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy

11

2604487.6

case number and type of account on such checks. These requirements are designed to provide a clear line of demarcation between the pre- and postpetition periods, and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

31.     The continuation of the Cash Management System is nevertheless permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Bankruptcy courts often waive the requirements contained in the U.S. Trustee Guidelines, recognizing that they are often impractical and potentially detrimental to a debtor's postpetition operations. *See, e.g., Southmark Corp. v. Grosz (In re Southmark Corp.),* 49 F.3d 1111, 1114 (5th Cir. 1995) (finding that the cash management system allows the debtor "to administer more efficiently and effectively its financial operations and assets"); *Official Comm. of Unsecured Creditors of the Columbia Gas Transmission Corp. v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys., Inc.),* 997 F.2d 1039, 1061 (3d Cir. 1993) (finding that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient").

32.     Here, requiring the Debtor to adopt a new, segmented cash management system at this critical stage of these chapter 11 proceedings would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to the operation of the Debtor's business. Importantly, the Cash Management System provides the Debtor with the ability to create status reports on the location and amount of funds which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds. As a result, any

12

disruption could have a severe and adverse effect on the Debtor's business and its ability to maximize value. By contrast, maintaining the current Cash Management System would greatly facilitate the Debtor's transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. Finally, maintaining the current Cash Management System will allow the Debtor's personnel to focus on their daily responsibilities in operating the business.

33.    The Debtor respectfully submits that parties in interest will not be harmed by maintenance of the existing Cash Management System, including the Bank Accounts, because the Debtor has implemented appropriate mechanisms to ensure that payments will not be made on account of obligations incurred before the Petition Date, other than those authorized by the Court. The Debtor will continue to work closely with the Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without the Court's approval. In light of such protective measures, the Debtor submits that maintaining the Cash Management System is in the best interests of its estate and creditors.

34.    Accordingly, the Debtor respectfully requests that the Court authorize the continued use of the existing Cash Management System to facilitate the Debtor's transition into chapter 11.[5] The Debtor also respectfully requests that, to the extent a Bank honors a prepetition check or other item drawn on any account that is the subject of this Motion, either at the direction of the Debtor or in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Bank will not be deemed to be liable to the Debtor or to its estate on account of such prepetition check or other item honored postpetition. Such relief is

---

[5] The Debtor also requests authority for the Banks to honor any check, draft, or other notification that the Debtor advised the Banks to have been drawn, issued, or otherwise presented prior to the Petition Date only to the extent authorized by order of the Court.

2604487.6

reasonable and appropriate because the Banks are not in a position to independently verify or audit whether the Debtor may pay a particular item in accordance with a Court order or otherwise.

35.    Courts in this District and other have regularly waived the U.S. Trustee Guidelines on the grounds that they are impractical and potentially detrimental to a debtor's postpetition business operations and restructuring efforts in similar large chapter 11 cases. *See, e.g., In re Caesars Entertainment Operating Co., Inc., et al.*, No. 15-01145 (ABG) (Bankr. N.D. Ill. Mar. 4, 2015) [Docket No. 989]; *In re ITR Concession Co.*, No. 14-34284 (PSH) (Bankr. N.D. Ill. Oct. 28, 2014); *In re ALCO Stores, Inc.*, No. 14-34941 (SGJ) (Bankr. N.D. Tex. Oct. 16, 2014) [Docket No. 70]; *In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. May 15, 2013); *In re GEI-RP (f/k/a Giordano's Enters., Inc.)*, No. 11-06098 (ERW) (Bankr. N.D. Ill. Feb. 17, 2011); *In re Gas City Ltd.*, No. 10-47879 (ERW) (Bankr. N.D. Ill. Oct. 28, 2010); *In re Corus Bankshares, Inc.*, No. 10-26881 (PSH) (Bankr. N.D. Ill. July 9, 2010).

## II.    The Court Should Authorize the Debtor to Continue Using the Business Forms

36.    The Debtor respectfully submits that parties in interest will not be prejudiced if the Debtor is authorized to continue to use its business forms substantially in the forms existing immediately before the Petition Date. Parties doing business with the Debtor undoubtedly will be aware of its status as debtor in possession and, thus, changing business forms is unnecessary and would be unduly burdensome. Indeed, courts in this District and others have allowed debtors to use their prepetition business forms without the "debtor in possession" label. *See, e.g., In re Caesars Entertainment Operating Co., Inc., et al.*, No. 15-01145 (ABG) (Bankr. N.D. Ill. Mar. 4, 2015) [Docket No. 989]; *In re ITR Concession Co.*, No. 14-34284 (PSH) (Bankr. N.D. Ill. Oct. 28, 2014); *In re ALCO Stores, Inc.*, No. 14-34941 (SGJ) (Bankr. N.D. Tex. Oct. 16, 2014)

[Docket No. 70]; *In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. May 15, 2013); *In re Corus Bankshares, Inc.*, No. 10-26881 (PSH) (Bankr. N.D. Ill. July 9, 2010); *In re Bridgeview Aerosol, LLC*, No. 09-41021 (PSH) (Bankr. N.D. Ill. Nov. 2, 2009); *In re XHM Corp. 1 (f/k/a Hartmarx Corp.)*, No. 09-02046 (BWB) (Bankr. N.D. Ill. Jan. 26, 2009).

## III.   The Court Should Authorize the Debtor to Continue Conducting Affiliate Transactions in the Ordinary Course

37.     The Debtor's funds move through the Cash Management System as described above and, at any given time, there may be Affiliate Claims owing by and between the Debtor and an Affiliate. In addition, and as described above, Affiliate Transactions are regularly made between and among the Debtor and Affiliates in the ordinary course as part of the Cash Management System.[6] The Debtor tracks all fund transfers in its accounting system and can ascertain, trace, and account for all Affiliate Transactions. The Debtor, moreover, will continue to maintain records of such Affiliate Transactions.

38.     Since these transactions could be considered extensions of Affiliate credit made in the ordinary course of business that are an essential component of the Cash Management System, the Debtor respectfully requests the authority to continue conducting the Affiliate Transactions in the ordinary course of business without need for further Court order.[7] If the Affiliate Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtor's and its estate's detriment. In addition, a number of critical shared services currently provided by and between the Debtor and the Affiliates would be

---

[6] Because the Debtor engages in Affiliate Transactions on a regular basis and such transactions are common among enterprises similar to the Debtor, the Debtor submits that the Affiliate Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's approval. Nonetheless, out of an abundance of caution, the Debtor is seeking express authority to engage in such transactions on a postpetition basis. Moreover, the continued performance of the ordinary course Affiliate Transactions is integral to ensure the Debtor's ability to operate its business as a debtor in possession.

[7] The Debtor is not seeking to assume the Affiliate Transactions as executory contracts at this time.

disrupted, including the sale of Debtor's inventory, payroll and vendor payments, likely resulting in a needless destruction of stakeholder value.

39.     Accordingly, the Debtor respectfully submits that the continued performance of the Affiliate Transactions is in the best interest of the Debtor's estate and its creditors and, therefore, the Debtor should be permitted to continue such performance.

40.     Similar relief has been regularly granted by courts in this District in complex chapter 11 cases. *See In re ITR Concession Co.*, No. 14-34284 (PSH) (Bankr. N.D. Ill. Oct. 28, 2014); *In re Edison Mission Energy*, No. 12-49219 (JPC) (Bankr. N.D. Ill. May 15, 2013); *In re Kimball Hill, Inc.*, No. 08-10095 (SPS) (Bankr. N.D. Ill. May 13, 2008); *In re UAL Corp.*, No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002); *In re Dade Behring Holdings, Inc.*, No. 02-29020 (BWB) (Bankr. N.D. Ill. Aug. 1, 2002).

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

41.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." The Debtor respectfully submits that granting the relief requested herein is integral to the Debtor's ability to transition its operations into chapter 11, and that denying this Motion could severely disrupt the Debtor's operations at this critical juncture. The relief requested herein is necessary in order for the Debtor to operate its business in the ordinary course and preserve the ongoing value of the Debtor's operations and maximize the value of its estate for the benefit of all stakeholders. Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003.

2604487.6

## WAIVER OF BANKRUPTCY RULE 6004(H)

42.     The Debtor requests that the Court waive the fourteen (14) day stay period contained in Bankruptcy Rule 6004(h).

## NOTICE

43.     Notice of this Motion has been provided to (i) the office of the United States Trustee for the Northern District of Illinois, (ii) the holders of the twenty (20) largest unsecured claims against the Debtor, (iii) counsel to FCC, (iv) MMB, and (v) all other parties requesting notice in these chapter 11 cases. The Debtor respectfully submits that no other or further notice need be provided.

## WAIVER OF PAGE LIMIT RESTRICTIONS

44.     Given the complexity of the issues addressed herein, the Debtor respectfully requests that the Court waive the fifteen page limit established by Local Rule 5005-3(D).

## NO PRIOR REQUEST

45.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests entry of interim and final orders, substantially in the form attached hereto as **Exhibit C** and **Exhibit D**, respectively, granting the relief requested herein and granting such other relief as may be just and proper.

17

2604487.6

Respectfully submitted this 29th day of April, 2015.

FRANKGECKER LLP

*/s/ Joseph D. Frank*
   Joseph D. Frank
   Frances Gecker
325 N. LaSalle Street, Suite 625
Chicago, Illinois 60654
Telephone: (312) 276-1400
Facsimile:  (312) 276-0035
Email:  jfrank@fgllp.com
      fgecker@fgllp.com

-and-

GRAY REED & MCGRAW, P.C.
   Jason S. Brookner (pro hac vice pending)
   Micheal W. Bishop (pro hac vice pending)
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:  jbrookner@grayreed.com
      mbishop@grayreed.com

**PROPOSED COUNSEL TO THE DEBTOR**

18

2604487.6

## EXHIBIT A

### Debtor's Prepetition Bank Accounts

| Bank Account Name | Name of Financial Institution | Account No. (Last 4 digits only) |
|---|---|---|
| Advance Account | Merchants and Manufacturers | 2867 |
| Collection Account | Merchants and Manufacturers | 2859 |
| Operating Account No. 1 | Merchants and Manufacturers | 2506 |
| Operating Account No. 2 (Dormant) | Merchants and Manufacturers | 1704 |
| Payroll Account | Merchants and Manufacturers | 2255 |

2604487.6

# **EXHIBIT B**

Funds Flow Diagram

2604487.6

# Gulf Packaging Inc. Cash Collateral Flow Chart



## EXHIBIT C

Proposed Interim Order

2604487.6

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GULF PACKAGING, INC.,[1] | ) | Case No. 15- _____ (___) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE
USING ITS CASH MANAGEMENT SYSTEM, (B) MAINTAIN ITS
EXISTING BANK ACCOUNTS AND BUSINESS FORMS AND (C) CONTINUE
TRANSACTIONS WITH AFFILIATES, AND (II) GRANTING RELATED RELIEF**

Upon the Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (a)

Continue Using Its Cash Management System, (b) Maintain Its Existing Bank Accounts and

Business Forms and (c) Continue Transactions with Affiliates, and (II) Granting Related Relief,

filed by Gulf Packaging, Inc., the above-captioned debtor and debtor in possession (the

"Debtor"); and the Court having jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334, and consideration of the Motion being a core proceeding pursuant to 28 U.S.C. §

157(b)(2); and the Court finding that the relief requested in the Motion is in the best interests of

the Debtor's estate; and it appearing that due and sufficient notice of the Motion has been

provided by the Debtor under the circumstances and that no other or further notice is required;

and upon the hearing on the Motion conducted on April __, 2015 and the record made thereat;

and after due deliberation and good cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.[2]

2.      A final hearing (the "Final Hearing") on the Motion shall take place on

---

[1] The last four digits of the Debtor's tax identification number are 5030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

_____, 2015, at__:__ [a/p].m., prevailing Central Time. Objections, if any, to the relief requested in the Motion and entry of the Final Order shall be filed with the Clerk of the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, and served on the following parties, such as to be actually received no later than _____, 2015 at __:__ __.m. prevailing Central Time: (i) Gray Reed & McGraw, P.C., 1601 Elm Street, Suite 4600, Dallas, Texas 75201 Attention: Jason S. Brookner and FrankGecker LLP, 325 N. LaSalle Street, Suite 625, Chicago, Illinois, 60654, Attention: Joseph D. Frank, Counsel to the Debtor; (ii) Goldberg Kohn Ltd., 55 East Monroe Street, Suite 3300, Chicago Illinois 60603, Attention Dimitri G. Karcazes, Counsel to FCC; (iii) the Office of the United States Trustee for the Northern District of Illinois, 219 S. Dearborn Street, Room 873, Chicago, Illinois 60604; (iv) Merchants and Manufacturers Bank and its counsel, if any; (v) counsel to any statutory committee appointed in this chapter 11 case; and (vi) any party that has filed a notice of appearance and request for service of pleadings in this case. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3.      The Debtor is authorized, but not directed, to (a) continue operating the Cash Management System, substantially as identified on **Exhibit B** attached to the Motion and as described in the Motion, (b) honor its prepetition obligations related thereto, (c) maintain existing business forms, and (d) continue conducting ordinary course Affiliate Transactions, including without limitation the Affiliate Transactions described in the Motion; *provided however*, that the Debtor shall not pay for any goods or services provided by the Affiliates to the Debtor prior to the Petition Date, unless otherwise authorized by this Court.

4.      The Debtor is further authorized, but not directed, to (a) continue to use, with the same account numbers, the Bank Accounts in existence as of the Petition Date, including

2

those accounts identified on **Exhibit A** attached to the Motion, (b) use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders, and invoices), as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtor's status as debtor in possession, (c) treat the Bank Accounts for all purposes as accounts of the Debtor as debtor in possession, (d) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, wire transfers, and other debits, (e) pay any Bank Fees for prepetition transactions that are charged postpetition, (f) reimburse the Banks for any claims arising before or after the Petition Date in connection with customer checks deposited with the Banks that have been dishonored or returned as a result of insufficient funds in its Bank Accounts, and (g) pay any ordinary course Bank Fees incurred in connection with the Bank Accounts and related cash management services, and to otherwise perform its obligations under the documents and agreements governing the Bank Accounts and related cash management services. For clarity, Bank Fees shall not include any indebtedness or fees that may be owing to FCC under the FCC Facility unless otherwise authorized by this Court.

5.     The Banks are authorized without the need for further order of this Court to: (a) continue to maintain, service, and administer the Bank Accounts as accounts of the Debtor as debtor in possession and provide related treasury and cash management services as described in paragraph 4 above, without interruption and in the ordinary course; (b) receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, ACH transfers, credit card payments, other electronic transfers, or other items presented, issued, or drawn on the Bank Accounts (collectively, the "Disbursements"); and (c) debit or charge back the Bank Accounts for all undisputed prepetition and postpetition Bank Fees, *provided, however,* that no

Disbursements (excluding any electronic fund transfers that the Banks are obligated to settle) presented, issued, or drawn on the Bank Accounts prior to the Petition Date shall be honored, unless (i) authorized by order of this Court, (ii) not otherwise prohibited by a "stop payment" request received by the Banks from the Debtor, and (iii) supported by sufficient available funds in the Bank Account in question.

6.      The Debtor's credit card processors are authorized to process payments in the ordinary course of business, including the netting out of any fees and/or chargebacks whether arising before or after the Petition Date.

7.      In the course of providing cash management services to the Debtor, each of the Banks at which the Bank Accounts are maintained is authorized, without further order of this Court, to deduct the applicable fees from the appropriate accounts of the Debtor, and further, to charge back to the appropriate accounts of the Debtor any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, or other electronic transfers of any kind, regardless of whether such items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

8.      Any payment that is authorized by the Debtor and paid from a Bank Account by a Bank before the Petition Date (including any ACH Payment such Bank is or becomes obligated to settle), shall be deemed to be paid prepetition, whether or not actually debited from the Bank Account prepetition.

9.      Subject to the terms set forth herein, the Banks are authorized to accept, honor and rely upon all representations of the Debtor with respect to whether any Disbursement should be honored pursuant to any order of this Court, whether or not such Disbursements are dated

4

prior to, on, or subsequent to the Petition Date, and whether or not the Banks believe the payment is authorized by an order of this Court. No Bank shall be deemed in violation of this Interim Order or any other order or have any liability to any party for honoring any Disbursement either (a) at the direction of the Debtor, (b) in the good faith belief that the Court has authorized such Disbursement to be honored, or (c) as a result of an innocent mistake.

10.    Any Banks are further authorized to (a) honor the Debtor's directions with respect to the opening and closing of any Bank Account and (b) accept and hold the Debtor's funds in accordance with the Debtor's instructions; *provided, however,* that the Banks shall not have any liability to any party for relying on such representations.

11.    Subject to the Cash Collateral Order (as defined below), Debtor is authorized to open any new bank accounts or close any existing Bank Accounts as it may deem necessary and appropriate in its sole discretion; *provided, however,* that the Debtor shall give notice within fourteen (14) days to counsel to FCC, the U.S. Trustee and any statutory committees appointed in this chapter 11 case; *provided further, however,* that the Debtor shall open any such new bank account at a bank that has executed a Uniform Depository Agreement with the U.S. Trustee, or at such bank that is willing to immediately execute such an agreement.

12.    The requirement to establish separate accounts for cash collateral and/or tax payments is hereby waived.

13.    Subject to the Cash Collateral Order (as defined below), notwithstanding anything seemingly to the contrary set forth herein, the Debtor is authorized to continue Affiliate Transactions arising from or related to the operation of its business in the ordinary course; *provided, however,* that for the avoidance of doubt, the Debtor shall not be authorized by this Interim Order to (a) directly or indirectly, make any distribution on account of an equity interest

5

in the Debtor held by an Affiliate or its beneficial owner, (b) undertake any other Affiliate Transaction that is not on the same terms as, or materially consistent with, the Debtor's operation of its business in the ordinary course during the prepetition period, or (c) pay any indebtedness or fees owing to FCC. In connection with the Affiliate Transactions, the Debtor shall continue to maintain current records with respect to all transfers of cash so that all Affiliate Transactions may be readily ascertained, traced, and properly recorded on the Affiliate accounts.

14.     As soon as practicable after entry of this Interim Order, the Debtor shall serve a copy of this Interim Order on the Banks.

15.     Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any prepetition claim against the Debtor; (b) a waiver of the Debtor's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtor's rights under the Bankruptcy Code or any other applicable law.

16.     Notwithstanding anything to the contrary contained herein, the relief granted in this Interim Order and any payment to be made, or any authorization contained, hereunder shall be subject to the terms of any orders granting the use of cash collateral approved by this Court in this chapter 11 case, including with respect to any budgets governing or relating to such use (collectively, the "Cash Collateral Order"), and to the extent there is any inconsistency between the terms of the Cash Collateral Order and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral Order shall control.

6

2605888.3

17.     Notwithstanding anything herein to the contrary, nothing in this Interim Order shall modify or otherwise affect the terms and provisions of any bank account control agreement or similar agreement as may exist from time to time between the Debtor and FCC.

18.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

19.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

20.     Notwithstanding Local Rule 5005-3(D), the Debtor is authorized to file the Motion in an amount exceeding 15 pages without filing a separate motion for relief.

21.     The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

22.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.


Dated: _____, 2015
Chicago, Illinois                              UNITED STATES BANKRUPTCY JUDGE

2605888.3

# **EXHIBIT D**

Proposed Final Order

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GULF PACKAGING, INC.,[1] | ) | Case No. 15- _____ (___) |
| | ) | |
| Debtor. | ) | |

**FINAL ORDER (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE
USING ITS CASH MANAGEMENT SYSTEM, (B) MAINTAIN ITS
EXISTING BANK ACCOUNTS AND BUSINESS FORMS AND (C) CONTINUE
TRANSACTIONS WITH AFFILIATES, AND (II) GRANTING RELATED RELIEF**

Upon the Motion (the "Motion") for Entry of Interim and Final Orders (I) Authorizing the Debtor to (a) Continue Using Its Cash Management System, (b) Maintain Its Existing Bank Accounts and Business Forms and (c) Continue Transactions with Affiliates, and (II) Granting Related Relief, filed by Gulf Packaging, Inc., the above-captioned debtor and debtor in possession (the "Debtor"); and the Court having jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and consideration of the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court finding that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest; and it appearing that due and sufficient notice of the Motion has been provided by the Debtor under the circumstances and that no other or further notice is required; and upon the hearing on the Motion conducted on _____, 2015 and the record made thereat; and after due deliberation and good cause appearing therefor, it is HEREBY ORDERED THAT:

1.     The Motion is granted on a final basis as set forth herein.[2]

---

[1] The last four digits of the Debtor's tax identification number are 5030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2.      The Debtor is authorized, but not directed, to (a) continue operating the Cash Management System, substantially as identified on **Exhibit B** attached to the Motion and as described in the Motion, (b) honor its prepetition obligations related thereto, (c) maintain existing business forms, and (d) continue conducting ordinary course Affiliate Transactions, including without limitation the Affiliate Transactions described in the Motion; *provided however*, that the Debtor shall not pay for any goods or services provided by the Affiliates to the Debtor prior to the Petition Date, unless otherwise authorized by this Court.

3.      The Debtor is further authorized, but not directed, to (a) continue to use, with the same account numbers, the Bank Accounts in existence as of the Petition Date, including those accounts identified on **Exhibit A** attached to the Motion, (b) use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders, and invoices), as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtor's status as debtor in possession, (c) treat the Bank Accounts for all purposes as accounts of the Debtor as debtor in possession, (d) deposit funds in and withdraw funds from the Bank Accounts by all usual means, including checks, wire transfers, and other debits, (e) pay any Bank Fees for prepetition transactions that are charged postpetition, (f) reimburse the Banks for any claims arising before or after the Petition Date in connection with customer checks deposited with the Banks that have been dishonored or returned as a result of insufficient funds in its Bank Accounts, and (g) pay any ordinary course Bank Fees incurred in connection with the Bank Accounts and related cash management services, and to otherwise perform its obligations under the documents and agreements governing the Bank Accounts and related cash

2

management services. For clarity, Bank Fees shall not include any indebtedness or fees that may be owing to FCC under the FCC Facility unless otherwise authorized by this Court.

      4.    The Banks are authorized without the need for further order of this Court to: (a) continue to maintain, service, and administer the Bank Accounts as accounts of the Debtor as debtor in possession and provide related treasury and cash management services as described in paragraph 4 above, without interruption and in the ordinary course; (b) receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, ACH transfers, credit card payments, other electronic transfers, or other items presented, issued, or drawn on the Bank Accounts (collectively, the "Disbursements"); and (c) debit or charge back the Bank Accounts for all undisputed prepetition and postpetition Bank Fees, *provided, however,* that no Disbursements (excluding any electronic fund transfers that the Banks are obligated to settle) presented, issued, or drawn on the Bank Accounts prior to the Petition Date shall be honored, unless (i) authorized by order of this Court, (ii) not otherwise prohibited by a "stop payment" request received by the Banks from the Debtor, and (iii) supported by sufficient available funds in the Bank Account in question.

      5.    The Debtor's credit card processors are authorized to process payments in the ordinary course of business, including the netting out of any fees and/or chargebacks whether arising before or after the Petition Date.

      6.    In the course of providing cash management services to the Debtor, each of the Banks at which the Bank Accounts are maintained is authorized, without further order of this Court, to deduct the applicable fees from the appropriate accounts of the Debtor, and further, to charge back to the appropriate accounts of the Debtor any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire

3

transfers, or other electronic transfers of any kind, regardless of whether such items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers.

7.       Any payment that is authorized by the Debtor and paid from a Bank Account by a Bank before the Petition Date (including any ACH Payment such Bank is or becomes obligated to settle), shall be deemed to be paid prepetition, whether or not actually debited from the Bank Account prepetition.

8.       Subject to the terms set forth herein, the Banks are authorized to accept, honor and rely upon all representations of the Debtor with respect to whether any Disbursement should be honored pursuant to any order of this Court, whether or not such Disbursements are dated prior to, on, or subsequent to the Petition Date, and whether or not the Banks believe the payment is authorized by an order of this Court. No Bank shall be deemed in violation of this Final Order or any other order or have any liability to any party for honoring any Disbursement either (a) at the direction of the Debtor, (b) in the good faith belief that the Court has authorized such Disbursement to be honored, or (c) as a result of an innocent mistake.

9.       Any Banks are further authorized to (a) honor the Debtor's directions with respect to the opening and closing of any Bank Account and (b) accept and hold the Debtor's funds in accordance with the Debtor's instructions; *provided, however,* that the Banks shall not have any liability to any party for relying on such representations.

10.      Subject to the Cash Collateral Order (as defined below), the Debtor is authorized to open any new bank accounts or close any existing Bank Accounts as it may deem necessary and appropriate in its sole discretion; *provided, however,* that the Debtor shall give notice within fourteen (14) days to counsel to FCC, the U.S. Trustee and any statutory committees appointed

4

in this chapter 11 case; *provided further, however*, that the Debtor shall open any such new bank account at a bank that has executed a Uniform Depository Agreement with the U.S. Trustee, or at such bank that is willing to immediately execute such an agreement.

11.     The requirement to establish separate accounts for cash collateral and/or tax payments is hereby waived.

12.     Subject to the Cash Collateral Order (as defined below), notwithstanding anything seemingly to the contrary set forth herein, the Debtor is authorized to continue Affiliate Transactions arising from or related to the operation of its business in the ordinary course; *provided, however*, that for the avoidance of doubt, the Debtor shall not be authorized by this Final Order to (a) directly or indirectly, make any distribution on account of an equity interest in the Debtor held by an Affiliate or its beneficial owner, (b) undertake any other Affiliate Transaction that is not on the same terms as, or materially consistent with, the Debtor's operation of its business in the ordinary course during the prepetition period, or (c) pay any indebtedness or fees owing to FCC. In connection with the Affiliate Transactions, the Debtor shall continue to maintain current records with respect to all transfers of cash so that all Affiliate Transactions may be readily ascertained, traced, and properly recorded on the Affiliate accounts.

13.     As soon as practicable after entry of this Final Order, the Debtor shall serve a copy of this Final Order on the Banks.

14.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any prepetition claim against the Debtor; (b) a waiver of the Debtor's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this

5

2606113.3

Final Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtor's rights under the Bankruptcy Code or any other applicable law.

15.     Notwithstanding anything to the contrary contained herein, the relief granted in this Final Order and any payment to be made, or any authorization contained, hereunder shall be subject to the terms of any orders granting the use of cash collateral approved by this Court in this chapter 11 case, including with respect to any budgets governing or relating to such use (collectively, the "Cash Collateral Order"), and to the extent there is any inconsistency between the terms of the Cash Collateral Order and any action taken or proposed to be taken hereunder, the terms of the Cash Collateral Orders shall control.

16.     Notwithstanding anything herein to the contrary, nothing in this Final Order shall modify or otherwise affect the terms and provisions of any bank account control agreement or similar agreement as may exist from time to time between the Debtor and FCC.

17.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

18.     The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

19.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.


Dated: _____, 2015
Chicago, Illinois                          _____
                                           UNITED STATES BANKRUPTCY JUDGE

2606113.3