**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GULF PACKAGING, INC.,[1] | ) | Case No. 15- 15249  (PSH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

**DECLARATION OF EDWARD T. GAVIN, CTP IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

Edward T. Gavin declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chief Restructuring Officer for Gulf Packaging, Inc. ("GPI" or the "Debtor"), the above-captioned debtor and debtor in possession. I am a Certified Turnaround Professional ("CTP")[2], and make this declaration in support of GPI's chapter 11 petition and first day motions, based on both direct knowledge and after consultation with employees, professionals and management of the Debtor whom I believe are reliable.

2. On this date (the "Petition Date"), GPI filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). GPI continues to operate its business and manage its properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. I am familiar with the Debtor's' day-to-day operations, business affairs, and books and records. In order to enable the Debtor to operate effectively, to smooth the transition

---

[1] The last four digits of the Debtor's tax identification number are 5030.

[2] The suffix "CTP" refers to "Certified Turnaround Professional", a credential awarded by the Association of Certified Turnaround Professionals based upon, *inter alia,* at least five years' experience as a turnaround professional, passage of a rigorous examination, an extensive background check, and maintenance of continuing professional education.

2600937.8

into chapter 11, and to avoid any potential adverse effects as a result of the commencement of this chapter 11 case, GPI has requested various types of relief in several pleadings filed with the Court (the "First Day Motions").

4. I submit this Declaration in support of the First Day Motions and to otherwise provide the Court with the background facts of this chapter 11 case. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with management and professionals, and my review of relevant documents. If I were called to testify, I could and would testify competently to the facts set forth herein.

## THE DEBTOR'S BUSINESS

5. GPI is a national distributor of packaging equipment and supplies, which sells its product by and through several independent entities ("Affiliates").[3] Many of these Affiliates are also guarantors under GPI's credit facility with FCC, LLC d/b/a First Capital ("FCC"), discussed more fully below. When GPI is combined with the Affiliates, there are over twenty (20) warehousing locations, both public and private, to better serve GPI's customer base. When the Debtor is combined with the Affiliates, the overall aggregate amount of historical monthly sales is approximately $9.5 million.

## BUSINESS HISTORY AND CAPITAL STUCTURE

6. Gulf-Great Lakes Packaging Corporation was started in 1975 in Chicago, followed by Gulf Systems, Inc. in 1977, in Houston. As sales and the customer base increased, new "Gulf-related" entities were formed to serve particular geographic locations. These new entities were separate and independent companies, with the manager of the location in question

---

[3] As used herein, "Affiliate" means a company that has a relationship – formal or informal – to the Debtor, and sells packaging products under a variation of the Gulf name. Unless otherwise set forth, use of the term "Affiliate" is not intended to have the same meaning as the "affiliate" term of art defined in section 101(2) of the Bankruptcy Code. All rights with respect to this issue are reserved.

2

often receiving a portion of the equity in the new entity. It was advantageous to the business to maintain offices in various locations as a way to maintain and increase customer satisfaction, reduce shipping times and cost, and enhance customer service.

7. GPI was formed as a Texas corporation on February 14, 2012. The concept at the time was for the independent Affiliates to "roll-up" into GPI and operate, at least publicly, as one large national company. The Affiliates would remain as separate legal entities with their own separate ownership, but GPI would centralize all of the accounting, marketing and other administrative tasks to take advantage of synergies and minimize costs.

8. GPI is a private company, with its equity held in equal parts by the Fleck Family Partnership, LLC and CWJ Eagle, LLC (which is affiliated with the Cutshall family). The members of GPI's board of directors are Jeff Cutshall, Bill Cutshall, Maggie Fleck and Joe Fleck. As set forth below, individuals within the Cutshall and Fleck families have also provided limited guarantees of the debt owing to GPI's secured lender, FCC.

9. In furtherance of a contemplated roll-up of GPI and the Affiliates, GPI entered into that certain Loan and Security Agreement dated as of March 31, 2014 between GPI and FCC (as amended, modified and/or supplemented from time to time, the "FCC Facility"), pursuant to which FCC made loans and other financial accommodations to or for the benefit of the Debtor. In connection with the FCC Facility, GPI also entered into certain other collateral and ancillary documents (such documents, together with the FCC Facility, are collectively referred to as the "FCC Loan Documents"). Advances under the FCC Facility are secured by a first lien on substantially all of GPI's assets. Guarantees have also been issued to FCC, from the following persons and Affiliates:

- Gulf Arizona Packaging Corporation ("Gulf Arizona")
- Carolina-Gulf Packaging, LLC ("Gulf Carolina")

2600937.8

- Florida Gulf Properties, LLC ("Florida Gulf")
- Gulf Packaging-Sacramento, LLC ("Gulf Sacramento")
- Gulf Systems, Inc. ("GSI")
- Gulf-Pacific Packaging Corporation ("Gulf Pacific")
- Gulf-Great Lakes Packaging Corporation ("GGL" or "Gulf Great Lakes")
- Carl Fleck
- Maggie Fleck
- Carol Cutshall
- Jeff Cutshall

10. The Affiliate guarantees are secured. Although the guarantees from the individuals are limited and unsecured, the equity owners of GPI (Fleck Family Partnership and CWJ Eagle) have pledged their equity interests in the Debtor as security.

11. Under the FCC Facility, GPI may borrow up to 85% of eligible accounts receivable, and 50% of eligible inventory value. As draws are made by GPI under the FCC Facility, the funds are deposited into GPI's operating account at Merchants and Manufacturer's Bank ("MMB"), and used for normal operating expenses. As of the Petition Date, approximately $9.4 million is owing to FCC under the FCC Facility, and GPI has approximately 900 unsecured trade vendors owed approximately $17 million in the aggregate.

12. In addition, MMB is lender to GPI for various equipment financings. These loans are secured by first priority liens on the underlying equipment or machinery being financed. Some of this equipment is situated at GPI's facilities, while some has been provided to GPI's customers. In some cases, a portion of the customer's accounts payable to GPI includes payments for the financed equipment on their premises, which funds are remitted to MMB upon receipt. Otherwise, GPI pays MMB for these financings in the ordinary course of business. Both MMB and FCC are parties to an inter-creditor agreement that sets out the rights and obligations of each to the other.

13. For almost all of GPI's business,[4] either ADP Total Source or the Affiliates employ the sales persons who generate sales to customers. Customers issue purchase orders to GPI through one of the Affiliates, and GPI then issues a purchase order to its own trade vendors, thereby creating an account payable for GPI. GPI has the obligation to pay for the purchase and delivery of the goods in question, which are delivered to the customers. GPI creates an account receivable with the customer in the name of GPI with remittance by the customer to be made for the benefit of GPI to a Key Bank lock box account owned and controlled by FCC. On occasion, a customer may pay an Affiliate rather than GPI. In those instances, the funds are sent by the Affiliate to the lock box account at Key Bank.

14. Generally speaking, there is a 20% gross profit margin on each sale made by GPI. Typically, GPI and the Affiliates split that margin evenly, to enable the Affiliates to cover direct selling costs and commissions owed to salespeople. The share to GPI is then used to reimburse the Affiliates for their operating costs relative to their sales and marketing operations, and to pay GPI's operating costs. The costs reimbursed to the affiliates include payroll, freight, utilities, warehousing and other routine operating costs. The costs borne by GPI include payroll and employee benefits, rent and other facilities costs, and infrastructure-related costs, such as I.T. services.

15. As described more fully below, the anticipated roll-up of GPI and the Affiliates never came to complete fruition. While the companies presented themselves to market as a

---

[4] In addition to the standard sale of packaging products and supplies as described herein, GPI sells packaging equipment (that is, equipment used to package products). On occasion GPI may lease equipment to a customer with a buyout option at the end of the term. In other instances, GPI may provide a piece of equipment free of charge in exchange for the customer purchasing consumable products, with which the equipment is used, from GPI. In this scenario, the equipment remains the property of GPI. Finally, GPI also has consignment arrangements with certain of its customers. In these instances, GPI keeps its inventory on the customer's floor and reconciles once per month. GPI bills the customer for the monthly usage and then replenishes the stock back to appropriate levels.

single national entity, the nature of the separate businesses operating semi-autonomously created certain complexities that were not sufficiently overcome.

## EVENTS LEADING TO CHAPTER 11

16. Sales were generally down in 2013, while GPI experienced increased costs and capital expenditures to make acquisitions and help initiate the informal roll-up. In late 2013, one of GPI's lenders decided to exit the asset-based finance business, necessitating a refinancing of that credit facility. Roughly concomitant with this event, MMB implemented certain risk minimization measures and informed GPI that its working capital facility would be significantly reduced in size. This lead GPI to seek replacement financing, which was ultimately obtained from FCC.

17. Upon the closing of the FCC facility, on April 1, 2014, the company began the process of formalizing the roll-up and attempted to consolidate common operations to eliminate redundancies and capture operating efficiencies. Unfortunately, the Company failed to realize cost reductions from the roll-up in time to benefit from variable cost efficiencies during the historically busy sale season of the second and third quarters in 2014. As a result, the FCC Facility was drawn to capacity. The ensuing lack of liquidity necessary for GPI to purchase inventory created an extended sales backlog. In October 2014, FCC provided notice to the Company regarding the existence of a state of default under the credit agreement between the Company and FCC.

18. In late December 2014, GPI discovered a discrepancy in cash handling resulting from the incomplete consolidation of Affiliate bank account controls. Instead of customer receivables being sent to the Key Bank "lockbox" account, some remittances were incorrectly sent to the Affiliates' remittance addresses used before the onset of the roll-up. These Affiliates

paid their routine payables, such as utility bills, from their accounts using these funds not realizing that they were being paid from the lender's unapplied collateral. This cash management error resulted in GPI's accounts receivables being reduced with the receipt of customer payments by the Affiliates, but without the required pay-down on the FCC Facility through application of those cash payments against the FCC debt.

19.     As a result on or about December 31, 2014, FCC informed GPI that it was in a state of over-advance on the FCC Facility, and froze advances for seven days to allow accounts receivable receipts to bring the loan back into balance.

20.     These even tighter liquidity constraints left GPI unable to purchase inventory to satisfy its growing sales backlog. Then, in January of 2015, the West Coast port slowdown, which resulted from labor issues, also prevented certain sales from being fulfilled. A significant portion of GPI's business on the West Coast is connected to customers active in the export hay industry: GPI provides sleeves for bailing hay and also sells complementary packaging materials to those exporters. The dock strike all but crippled the export of hay, which resulted in GPI having to sit on inventory that would have normally turned over on a monthly basis. As a consequence, GPI ordered the product from its vendors creating a payable liability, but was unable ship and, thus, collect the revenues that would have been generated from delivery. This situation effectively held hostage $600,000 of liquidity in the form of inventory purchased, but that could not be invoiced or collected, leading to an approximate $700,000 missed invoicing opportunity on that inventory plus aggregate lost sales of between approximately $2 million and $2.5 million in complementary products.

21.     In an attempt to address its financial issues, GPI approached several groups for an infusion of capital, and eventually entered into a letter of intent with a potential equity partner

who would have provided much-needed liquidity and, among other things, completed the roll-up in conjunction with a sale of the majority ownership of the Company and its Affiliates. The letter of intent targeted a closing during the first week of April 2015. After a few weeks of due diligence, however, in late March 2015, the letter of intent with this potential equity partner was terminated. By this point, GPI's vendor community was reacting to GPI's financial distress, and sales were down from previous years. Vendors began to establish or tighten credit terms, demanding pay-down of open balances with new orders, and attempted to exercise self-help remedies. As a result of this distress and a perceived inability for GPI to fill orders by purchasing product, some of the sales teams at the Affiliates – who are integral to GPI's business – began to leave and take customers with them.

22. In late March 2015, GPI hired the firm of Gavin/Solmonese, LLC as crisis manager, to help evaluate GPI's options and otherwise help maximize the value of the business for the benefit of GPI's constituents. Prior to the filing of this chapter 11 case, I was appointed as the Debtor's Chief Restructuring Officer. As of the Petition Date, GPI had accounts receivable in the amount of approximately $8.55 million and inventory with a booked value of $7.6 million.

23. GPI intends to use the chapter 11 process to protect and maximize the value of its assets through an orderly wind-down, by collecting existing accounts receivable and sales of existing inventory. GPI is already in discussions with a number of parties interested in acquiring certain assets and/or inventory.

## FIRST DAY MOTIONS

### A.    Motion to Use Cash Collateral

24.    By its Motion for Order (A) Authorizing Use of Cash Collateral on an Emergency Basis Pending a Final Hearing and (B) Granting Adequate Protection and Providing Security and Other Relief to FCC as Lender (the "Cash Collateral Motion"), the Debtor seeks interim and final authorization to use FCC's Cash Collateral and provide adequate protection to FCC. The Debtor seeks interim authorization for cash collateral usage as soon as possible, followed by entry of a final cash collateral order in the time period contemplated by Bankruptcy Rule 4001(b) and as the Court's calendar permits.[5]

25.    The Debtor requires the use of Cash Collateral to fund its day-to-day operations. The Debtor does not have sufficient available sources of working capital and financing to carry on operations absent continued use of FCC's Cash Collateral. Indeed, absent the use of FCC's Cash Collateral, the Debtor's business will be brought to a halt, with damaging consequences for the Debtor, its estate and creditors. The Debtor proposes to protect FCC's interests in Cash Collateral through the adequate protection set forth in the Cash Collateral Motion and in the Order which includes replacement liens and super priority claims.

26.    The terms of Cash Collateral usage have been negotiated at arms' length with FCC, and FCC agrees to the use of its Cash Collateral on the terms set forth in the Cash Collateral Motion and the form of Order attached thereto.

---

[5] In addition to the matters expressly set forth in the Cash Collateral, the Debtor also requests that the Court authorize and approve other customary terms typically approved in connection with cash collateral matters, as more fully set forth in the Motion and the form of Order attached thereto.

2600937.8

**B.      Motion to Maintain Cash Management System, Bank Accounts and Business Forms**

27.     By its Motion For Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Using Its Cash Management System, (B) Maintain Its Existing Bank Accounts and Business Forms, and (C) Continue Transactions with Affiliates (the "Affiliate Transactions"), and (II) Granting Related Relief, (the "Cash Management Motion"), the Debtor seeks (i) authority to maintain its existing bank accounts and business forms, (ii) authority to maintain its cash management system, which includes the Affiliate Transactions, and (iii) a waiver of certain of the U.S Trustee's guidelines regarding authorized depository institutions.

28.     As set forth more fully in the Cash Management Motion, the Debtor, in the ordinary course of its businesses, maintains five (5) active operating bank accounts (collectively, the "Bank Accounts") maintained by the Debtor at MMB and one lock box account maintained by and in the name of FCC at Key Bank (collectively, the "Banks").  The Debtor's integrated Cash Management System is part of the ordinary course of its business and allows the Debtor to efficiently collect, transfer, and disburse funds generated by its operations.  The Cash Management System is vital to the Debtor's ability to its conduct business across the United States, and helps control funds, serves as a repository for cash receipts, manages cash disbursements, ensures cash availability, and reduces administrative expenses by facilitating the movement of funds among multiple entities by generally centralizing cash operations from a central location.  The Cash Management System generally is similar to those commonly employed by complex businesses comparable to that of the Debtor.

29.     As described in the Cash Management Motion, given the economic and operational scale of the Debtor's operations, any disruption to the Cash Management System would have an immediate adverse effect on the Debtor's business and operations to the detriment

2600937.8

of its estate and numerous stakeholders. Accordingly, to minimize the disruption caused by this chapter 11 case and to maximize the value of the Debtor's estate, the Debtor requests authority to continue to utilize its existing Cash Management System during the pendency of this chapter 11 case, subject to the terms described in the Cash Management Motion.

**C.  Motion to Pay Prepetition Sales and Use Taxes**

30.  By its Motion For Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees (as each is defined herein), and (II) Granting Related Relief (the "Tax Motion"), GPI seeks entry of interim and final orders (i) authorizing, but not directing, the Debtor to remit and pay certain Taxes and Fees in the ordinary course of business, without regard to whether such obligations accrued or arose before or after the commencement of this chapter 11 proceeding, (ii) authorizing the Debtor's banks to receive, process, honor and pay all checks, drafts, or other forms of payment ("Tax Payments") drawn or issued on the Debtor's bank accounts prior to the Petition Date in respect of such Taxes and Fees (or to re-issue checks and electronic transfers, as may be necessary), provided that sufficient funds are on deposit in the applicable accounts to cover such payments, along with certain related relief as set forth more fully in the Tax Motion and (iii) granting certain related relief as more fully set forth in the Tax Motion.

31.  In the ordinary course of business, the Debtor: (a) collects and incurs certain sales, use, franchise, income, property and other taxes (each is defined in the Tax Motion and, collectively, the "Taxes"); (b) incurs fees, assessments, and other similar charges necessary to operate its business, including fees related to Business Licenses and Permits and Other Fees (as defined in the Tax Motion and, collectively, the "Fees"); and (c) remits such Taxes and Fees to the appropriate taxing, licensing, regulatory, or other governmental authorities (collectively, the

11

"Taxing Authorities"). The Debtor pays or remits, as applicable, Taxes and Fees daily, weekly, monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, as required by applicable laws and regulations. Any failure by the Debtor to pay the Taxes and Fees could have a material adverse impact on its ability to operate.

32. Payment of the Taxes and Fees in the ordinary course of business is necessary and appropriate in this chapter 11 case. Among other things, and as set forth more fully in the Tax Motion: (a) certain of the Taxes and Fees are not property of the estate pursuant to section 541(a) of the Bankruptcy Code; (b) paying the Taxes and Fees will avoid potential audits, liens, or other enforcement actions while the Debtor focuses on maintaining and maximizing value of its assets; (c) the Debtor's directors and officers may be held personally liable for the non-payment of certain Taxes; and (d) certain Taxing Authorities may take precipitous actions against the Debtor's directors and officers for unpaid Taxes and Fees, which would distract the Debtor from its efforts to maintain and maximize the value of the Debtor's assets.

33. As a result, granting the Tax Motion is in the best interests of the Debtor and its estate.

**D.     Application to Retain Chief Restructuring Officer**

34. As one of its First Day Motions, GPI has filed its Application to (I) Retain Gavin/Solmonese LLC ("G/S") to (A) Provide the Debtor with a Chief Restructuring Officer and Certain Additional Personnel ("G/S Personnel"), and (B) Designate Edward T. Gavin, CTP as CRO Effective as of the Petition Date (the "CRO Application"). By the CRO Application, pursuant to sections 105 and 363(b) of the Bankruptcy Code and Bankruptcy Rule 2016, GPI seeks entry of an order (a) authorizing (i) the retention of G/S to provide the Debtor with a CRO as well as additional G/S Personnel to assist the CRO in the performance of his duties, and (ii)

designating Edward T. Gavin, CTP as the Debtor's CRO (together with the G/S Personnel, the "Engagement Personnel"), effective as of the Petition Date, and (b) granting related relief.

35. The Debtor requires the assistance of qualified and experienced restructuring managers with the resources, capabilities, and experience of G/S and the Engagement Personnel. G/S performs critical services that complement the services provided by the Debtor's other professionals.

36. The Debtor believes that G/S and the Engagement Personnel are well qualified to provide restructuring management services that will assist and enhance the Debtor's efforts to maximize the value of its estate. G/S has a wealth of experience in providing restructuring advisory services, and enjoys an excellent reputation in the restructuring community for services it has rendered on behalf of debtors and creditors throughout the United States.

37. G/S was retained by the Debtor in late March 2015, as the Debtor's crisis manager, in order to assist the Debtor with evaluating its options and otherwise help maximize the value of the business for GPI's constituents. Prior to the Petition Date, Mr. Gavin was appointed by the Debtor's board of directors as the CRO. The decision to retain G/S and employ Mr. Gavin as CRO is a sound exercise of the Debtor's business judgment.

38. First, Mr. Gavin has extensive experience as an advisor for many troubled companies and has extensive experience in chapter 11 cases. The Debtor believes that Mr. Gavin, in his capacity as CRO, and the G/S Personnel, will provide services that will benefit the Debtor's estate and creditors. In addition, G/S has extensive experience in providing restructuring consulting services in chapter 11 proceedings and enjoys an excellent reputation as a restructuring firm throughout the United States.

2600937.8

39. Second, Mr. Gavin and G/S Personnel, working in conjunction with the Debtor's senior management and other professionals, have already proven to be of invaluable assistance to the Debtor prepetition in connection with operational issues, assisting with short-term cash management activities, evaluating financial and operational alternatives, and coordinating the Debtor's overall efforts to prepare for and operate in chapter 11. Consequently, G/S's extensive knowledge about the Debtor will be invaluable during this chapter 11 case. Third, the economic terms of G/S's retention are fair, reasonable, and beneficial to the Debtor's estate, and were negotiated at arm's length. The Debtor believes that the Fee and Expense Structure (as defined in the CRO Application) is comparable to those generally charged by restructuring advisors of similar stature to G/S for similar engagements. Given the numerous issues that G/S may be required to address in the performance of its services hereunder, and the market prices for G/S's services for engagements of this nature both in and out of court contexts, the Debtor believes that the Fee and Expense Structure is in line with market compensation for similar services and is fair and reasonable. The Fee and Expense Structure, as well as the specific aspects of the engagement and retention are set forth more fully in the CRO Application itself.

40. Finally, although the Debtor will be seeking Court approval to retain other professionals, there should not be any duplication of effort. Indeed, the Debtor believes that the Engagement Personnel will complement, and not duplicate, the services to be rendered by the other professionals retained in this chapter 11 case. G/S will work cooperatively with all of the Debtor's other professionals to ensure that value is maximized and that services are not duplicated.

2600937.8

**E.       Retention of Claims, Noticing and Solicitation Agent**

41.     On this date, GPI also filed its Application Pursuant to 28 U.S.C. § 156(c) for Order (i) Authorizing the Debtor to Employ BMC Group, Inc. as the Debtor's Noticing, Claims, and Solicitation Agent, Effective as of the Petition Date and (ii) Appointing BMC Group, Inc. as Agent of the Bankruptcy Court (the "BMC Application").  By the BMC Application, the Debtor respectfully requests entry of an Order (i) authorizing the Debtor to employ BMC Group, Inc. ("BMC") as noticing, claims, and solicitation agent in connection with the Debtor's chapter 11 case, to provide the services outlined in the BMC Application, and (ii) appointing BMC as the Court's outside agent.

42.     BMC has substantial experience and expertise in the matters upon which it is to be engaged, and has provided noticing, claims and solicitation agent services in chapter 11 cases of this size and complexity in many jurisdictions, including the Northern District of Illinois. BMC is one of the country's leading chapter 11 administrators with vast experience in noticing, claims processing, administration and reconciliation, balloting, tabulation and distributions. BMC specializes in noticing, claims agent and balloting services, and has a proprietary claims management system in which claims are effectively managed for the Clerk's Office.

43.     The Debtor has selected BMC as its proposed agent because of the firm's experience in serving in chapter 11 cases of this size and complexity and the reasonableness of BMC's fees.  Parties in interest will benefit from BMC's significant experience and the efficient and cost-effective methods that it has developed.

44.     The Debtor believes, and respectfully submits, that BMC's retention is in the best interest of the estate in light of the large number of creditors and potential parties in interest, and the efficiencies that will be seen as a result of having an established claims and noticing expert

handle the large volume of claims and noticing issues that will arise during this chapter 11 case. Moreover, the Local Rules require that for cases having more than 500 creditors, the debtor is *required* to seek to employ "a notice of claims agent approved by the clerk" to "prepare and maintain the claims register." Local Rule 1007-2(B).

45. As a result, the Debtor respectfully submits that the BMC Application is proper and appropriate, and should be approved for the reasons set forth above and set forth more fully in the BMC Application.

**F.     Extension of Time to File Schedules and Statement of Financial Affairs**

46. By its Motion (the "Extension Motion") for Order Pursuant to Rules 1007(c) and 9006(b) of the Federal Rules of Bankruptcy Procedure Extending Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs (collectively, the "Schedules and Statement"), the Debtor seeks an additional thirty (30) days to file its Schedules and Statement.

47. As stated earlier, the Debtor has over 900 vendors, as well as other anticipated parties in interest. Although the Debtor has been working diligently to prepare the necessary motions and pleadings for this chapter 11 filing, the Debtor will be preoccupied with transitioning into chapter 11 and otherwise stabilizing the business within the next two weeks. Thus, the requested extension will ensure that the Schedules and Statement will be completed accurately and filed timely (the deadline to file the Schedules and Statement is presently May 13, 2015, fourteen days from the Petition Date). Completing the Schedules and Statement will require the compilation of a large amount of information from the Debtor's books, records, and documents.

48. Given the importance of Schedules and Statements in any chapter 11 case, the Debtor believes it is in the best interests of its estate, and the chapter 11 process in general, for

the Court to grant an extension of time so that the Debtor may completely, accurately, and fully complete the Schedules and Statement. The Debtor will file the Schedules and Statement in advance of the section 341 first meeting of creditors.

## CONCLUSION

49.     I respectfully request that the Court grant all relief requested in the First Day Motions, along with any and all other and further relief that the Court may deem to be just and proper.

50.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 29th day of April, 2015.

_____
Edward T. Gavin, CTP
Chief Restructuring Officer

2600937.8