**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GULF PACKAGING, INC., | ) | Case No. 15-15249 (PSH) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**ORDER PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE**
**AND BANKRUPTCY RULES 2002, 6004, AND 6006 (I) APPROVING**
**COMPREHENSIVE SALE PROCESS, BID PROCEDURES, AND CERTAIN BID**
**PROTECTIONS, (II) SCHEDULING A SALE HEARING, (III) APPROVING FORM**
**AND MANNER OF NOTICE, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion"), filed by Gulf Packaging, Inc., the above-captioned

debtor and debtor in possession (the "Debtor"), for orders pursuant to 11 U.S.C. §§ 363 and 365

and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (A) approving

comprehensive sale process, (B) approving the bidding procedures attached hereto as

Exhibit "A" (the "Bidding Procedures") and certain bid protections, (C) scheduling an auction

and sale hearing (the "Sale Hearing") and (D) authorizing and approving (i) the Sale of the

Debtor's business as a going concern or certain (or all) of its assets, free and clear of liens,

claims, interests, and encumbrances, (ii) the assumption and assignment of executory contracts

and unexpired leases of the Debtor as may be requested by the Stalking Horse (if any) or the

Successful Bidder (collectively, the "Assumed Contracts") and the proposed cure amounts with

respect thereto, (iii) assumption of certain liabilities (the "Assumed Liabilities"), and (E)

granting related relief; and the Court being satisfied that the relief requested in the Motion is

necessary and in the best interests of the Debtor and its estate and creditors; and it appearing that

sufficient notice of the Motion has been given, and that no other or further notice is required; and

upon the hearing on the Motion conducted on June 30, 2015 (the "Bidding Procedures Hearing")

and all of the other proceedings had before the Court; and after due deliberation and sufficient

cause appearing therefor, it is

HEREBY FOUND AND DETERMINED THAT:

A.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and
1334.

B.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

C.    The relief requested in the Motion is in the best interest of the Debtor, its estate,
creditors, and other parties in interest.

D.    The fourteen (14) day stay period established by Bankruptcy Rule 6004(h) is
waived.

E.    The fifteen (15) page limit established by Local Rule 5005-3(D) is waived.

F.    The notice given by the Debtor of the Motion and the Bidding Procedures
Hearing constitutes due and sufficient notice thereof under the circumstances, and no other or
further notice is required.

G.    The Debtor has articulated good and sufficient reasons for (i) approving the
Bidding Procedures, (ii) the grant of certain bid protections in favor of a potential Stalking
Horse, (iii) approving the manner of notice of the Motion, and establishing the Bid Deadline, the
Auction, the Sale Hearing, and the assumption and assignment of the Assumed Contracts and
proposed cure relating thereto, and (iv) the scheduling of the Sale Hearing.

H.    The Debtor's payment to a Stalking Horse (if any) of the Break-Up Fee on the terms set forth in this Order (i) is an actual and necessary cost and expense of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code, (ii) is of substantial benefit to the Debtor's estate, (iii) is reasonable and appropriate, in light of the size and nature of the potential Sale and the efforts that have been and will be expended by a potential Stalking Horse notwithstanding that the proposed Sale is subject to higher or better offers, (iv) was negotiated by the parties at arms' length and in good faith, and (v) is necessary to ensure that a potential Stalking Horse will continue to pursue its proposed acquisition of the Debtor's assets.

I.    The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Debtor's assets or as a going concern transaction.

THEREFORE, IT IS ORDERED AS FOLLOWS:

Auction and Bidding Procedures

1.    The Bidding Procedures attached hereto as Exhibit "A" and incorporated herein by reference as if fully set forth herein, are hereby approved and shall govern the Auction proceedings.

2.    Pursuant to the Bidding Procedures, and as set forth more fully therein, the Stalking Horse Bid Deadline shall be July 10, 2015, the Stalking Horse Declaration Deadline shall be July 11, 2015, the Bid Deadline shall be July 27, 2015, and the Auction shall be conducted on July 29, 2015.

3.    The Debtor is authorized to terminate the bidding process or the Auction at any time if it determines, in its business judgment, that the bidding process will not maximize value for the Debtor's estate.

4.    The general form APA attached hereto as Exhibit "B" and incorporated herein by reference as if fully set forth herein, is hereby approved and may be modified by the Debtor subject to consultation with FCC and the Committee.

Sale Hearing

5.    The Sale Hearing shall take place on July 30, 2015 at 10:30 a.m. (prevailing Central Time) in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, Dirksen Federal Building, 219 South Dearborn Street, Room No. 644, Chicago, Illinois 60604, at which time the Court shall consider the Motion, the proposed Sale, and confirm the results of the Auction, if any. Objections to the Motion and the proposed Sale shall be filed and served so as to be actually received no later than July 23, 2015 (the "Objection Deadline"). Objections, if any, shall be filed with the Clerk of the United States Bankruptcy Court, Northern District of Illinois, Eastern Division, Dirksen Federal Building, 219 S. Dearborn, Room 644, Chicago, Illinois 60604 (the "Court Clerk"), with copies served on the following parties: (a) counsel to the Debtor, Gray Reed & McGraw, P.C., 1601 Elm Street, Suite 4600, Dallas, TX 75201 (Attn: Jason S. Brookner), and FrankGecker LLP, 325 N. LaSalle Street, Suite 625, Chicago, Illinois 60654 (Attn: Joseph Frank); (b) counsel to the Committee, Freeborn & Peters, LLP, 311 South Wacker Drive, Suite 3000, Chicago, Illinois (Attn: Shelly DeRousse); (c) the Office of the U.S. Trustee, 219 S. Dearborn Street, Room 873 Chicago, Illinois 60604 (Attn:

Katy Gleason); and (d) counsel to FCC, Goldberg Kohn, Ltd., 55 East Monroe Street, Suite 3300, Chicago, Illinois 60603 (Attn: Dimitri G. Karcazes).

6.    The failure to timely file and serve an objection by the Objection Deadline shall be a bar to the assertion, prior to, at the Sale Hearing or thereafter, of any such objection to the Motion, the Sale, or the Debtor's consummation of the Sale. Notwithstanding the foregoing, the Objection Deadline shall not apply to any objection based upon any event occurring at the Auction.

7.    The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment made in open court.

Bid Protections

8.    The Break-Up Fee to be paid to a Potential Stalking Horse, as more fully described in the Motion and the APA, is hereby approved pursuant to the terms and conditions set forth in the Motion and APA without the need for further Order of this Court; *provided, however*, that notwithstanding any term to the contrary set forth in the APA or this Order, any potential Stalking Horse shall only be entitled to receive the Break-Up Fee in the event that the APA is terminated pursuant to Section 8.2(e) thereof. The Debtor's obligation to pay the Break-Up Fee, if any, as provided in the APA and this Order, shall survive termination of the APA and, if the Stalking Horse is not the successful bidder and is otherwise entitled to receive the Break-Up Fee pursuant to the terms of the APA and this Order, shall constitute a superpriority administrative expense pursuant to Bankruptcy Code Sections 503(b) and 507.

## Cure Notice

9.      In the event the Debtor seeks to assume and assign any contracts or leases, the Debtor shall file with the Court and serve upon affected counter-parties to the Assumed Contracts (if any) a "Notice of Cure Amounts" (the "Cure Notice," with such amounts set forth therein being "Cure Amounts") no later than the day of the Auction. Objections, if any, to the assumption and assignment of the Assumed Contracts or to the Cure Notice and any Cure Amount shall be filed and served so as to be actually received no later the date that is three (3) calendar days after the Auction. If an objection to the assumption and assignment of the Assumed Contracts or to the Cure Notice and any Cure Amount cannot be resolved consensually among the parties, then the Court shall determine such matters at a hearing to be set no later than six (6) calendar days after the Auction concludes. The Cure Amounts set forth in the Cure Notice shall be binding on all parties unless an objection thereto is timely filed and served. The failure to timely file and serve an objection shall be deemed consent to the assumption and assignment of the Assumed Contracts and to the Cure Amounts, and any and all objections thereto shall be deemed forever released and waived.

## Notice

10.     Within five (5) business days after entry of this Order (the "Mailing Date"), the Debtor shall serve the Motion, the APA, the Bidding Procedures, a copy of the Bidding Procedures Order and the Sale Notice (attached hereto as Exhibit "C"), by first-class U.S. mail, postage prepaid, upon: (a) all entities known to have expressed an interest in a liquidation or going concern sale transaction with the Debtor during the past year; (b) the U.S. Trustee; (c) counsel to the Committee; (d) counsel to the Debtor's secured lender, FCC; (e) counterparties to

the Debtor's executory contracts and unexpired leases; (f) all parties who have requested notice in this case; and (g) all parties with whom Equity Partners has been in contact and who have expressed an interest in potentially making a bid. Such notice shall be, and is hereby deemed to be, good and sufficient notice of the Auction, the Sale, the Sale Hearing, and the Bid Procedures and requirements applicable thereto.

<u>Additional Provisions</u>

11.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

JUN 3 0 2015

Signed on June _____, 2015

_____
Honorable Pamela S. Hollis
United States Bankruptcy Judge

# EXHIBIT "A"

## Bidding Procedures

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GULF PACKAGING, INC.,[1] | ) | Case No. 15-15249 (PSH) |
| | ) | |
| Debtor. | ) | |
| | ) | |

### BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to a proposed sale of all or a portion of the assets of Gulf Packaging, Inc. ("GPI" or the "Debtor") or a going concern transaction (the "Sale"). The transaction contemplated by these Bidding Procedures is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined herein) pursuant to Sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code").

On June 23, 2015, the Debtor filed its *Motion Pursuant to Sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 to (A) Approve Comprehensive Sale Process, (B) Approve Bidding Procedures and Certain Bid Protections, (C) Schedule a Sale Hearing, (D) Approve Form and Manner of Notice Related Thereto, (E) Authorize Sale Free and Clear of All Liens, Claims, Interests and Encumbrances, (F) Authorize Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Proposed Cure Amounts with Respect Thereto and (G) Grant Related Relief* [Docket No. ---] (the "Sale Motion"). On ____, 2015, the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court") entered its *Order Pursuant to Sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 (I) Approving Comprehensive Sale Process, Bid Procedures and Certain Bid Protections, (II) Scheduling a Sale Hearing, (III) Approving Form and Manner of Notice, and (IV) Granting Related Relief* [Docket No. ---] (the "Bidding Procedures Order") approving these Bidding Procedures. Pursuant to these Bidding Procedures, if any Qualified Bids are received before the Bid Deadline an Auction, as described herein, shall take place on July 29, 2015. The Bidding Procedures Order established July 30, 2015 as the date the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to approve the Sale.

The Bidding Procedures set forth herein describe, among other things, the manner in which bidders and bids become "Qualified Bidders" and "Qualified Bids," respectively, the receipt and negotiation of bids received, the conduct of any Auction (as defined herein), the ultimate selection of the Successful Bidder (as defined herein) and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process").

---

[1] The last four digits of the Debtor's tax identification number are 5030.

{GULFPACK/001/00043062.DOC/}                    1

6862581v2

Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Sale Motion.

## Sale of Assets or Going Concern Transaction

The Debtor is entertaining bids for (i) a going concern transaction, (ii) a sale of all or substantially all of its assets and (iii) a sale of such smaller portion of the Debtor's assets as may be subject to a purchase agreement and as may be bid upon at Auction. The Debtor may enter into one transaction or several transactions with multiple parties, depending upon the bids received.

In addition, (i) the Successful Bidder(s) shall assume the Assumed Liabilities as may be set forth in any purchase agreement and (ii) the Debtor shall assume and assign the Assumed Contracts to the Successful Bidder(s), as may be set forth in any purchase agreement(s) accepted by the Debtor.

## "As Is, Where Is"

Any transaction(s) entered into with the Debtor shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents, or estate, except as may be set forth in a purchase agreement(s) with a Successful Bidder(s) approved by the Bankruptcy Court.

## Free of Any and All Claims and Interests

Any transaction entered into with the Debtor shall be free and clear of all liens, claims, interests and encumbrances (collectively, the "Claims and Interests") with such Claims and Interests to attach to the net proceeds of the sale.

## Participation and Bid Requirements

Any person or entity who wishes to participate in the Bidding Process (a "Potential Bidder") must become a Qualified Bidder. As a prerequisite to becoming a Qualified Bidder, a Potential Bidder must deliver the following documents to the Debtor, FCC, LLC d/b/a First Capital ("FCC"), Equity Partners, Gavin/Solmonese and the Official Committee of Unsecured Creditors (the "Committee"), at the addresses set forth below, in advance of the Bid Deadline (as defined below), in a form and substance acceptable to the Debtor and its advisors (the "Required Bid Documents"):

(a)     Evidence of the Potential Bidder's financial ability to close a transaction, in a form and substance acceptable to the Debtor in its sole discretion, in consultation with FCC and the Committee. Such evidence may take the form of, among other things, current audited financial statements, bank statements, evidence of a financing commitment, or such other documentation as the Debtor may accept in its sole discretion;

(b)     A letter stating that the Potential Bidder's offer is irrevocable until immediately

{GULFPACK/001/00043062.DOC/}                    2

6862581v2

following the closing of the Sale, and setting forth (i) the nature of the transaction as a going concern or asset sale, which specifically identifies the specific assets or groups of assets to be purchased, and which includes the proposed consideration for the transaction and the liabilities (if any) to be assumed, (ii) any assets expected to be excluded from the transaction, and (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing);

(c)     A binding, executed and definitive copy a of the form Asset Purchase Agreement attached to the Sale Motion (the "APA"), together with all schedules thereto marked to show changes to the APA and schedules that the Potential Bidder proposes (a "Marked APA"), including the amount of consideration to be paid;

(d)     A good faith earnest money cash deposit (the "Deposit") in an amount equal to not less than (i) $200,000 if the bid in question is a going concern bid, or a bid for substantially all of the Debtor's assets or (ii) $50,000 if the bid in question is for a sale of what the Debtor deems to be 50% or less of its assets;

(e)     evidence of corporate authority to enter into the transaction;

(f)     An executed confidentiality agreement (a "Confidentiality Agreement") in a form and substance acceptable to the Debtor; and

(g)     Any additional information reasonably requested by the Debtor.

A Potential Bidder (i) who delivers the documents described in the previous subparagraphs above, (ii) whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Sale, if selected as the Successful Bidder, (iii) who the Debtor determines is likely (based on availability of financing, experience, and other considerations) to be able to consummate the Sale within the time frame provided by the APA, and (iv) whose bid constitutes a "**Qualified Bid**" pursuant to these Bidding Procedures, shall be deemed a "**Qualified Bidder**." As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtor shall determine whether such Potential Bidder is a Qualified Bidder, after such consultation with FCC and the Committee as may be appropriate, and shall notify the Potential Bidder of the same. FCC is a Qualified Bidder.

A bid will be deemed a "Qualified Bid" and considered by the Debtor only if the bid:

(a)     (i) is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Debtor than, those contained in the APA, and (ii) has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than 5% of any Stalking Horse Bid designated as such by the Debtor by the Stalking Horse Declaration Deadline;

(b)     contains no contingencies of any type, other than Bankruptcy Court approval of the transaction;

(c)     other than any Stalking Horse Bid(s) designated as such by the Debtor, is not conditioned upon any bid protections (such as a topping fee, termination fee, expense reimbursement, or similar type of payment);

(d)     contains an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Debtor and its assets and business prior to making its offer, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the business and assets of the Debtor in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Debtor's business or assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the APA or the Marked APA;

(e)     includes a list of Assumed Contracts and Assumed Liabilities (if any), and a commitment to consummate the transaction and the assumption of the Assumed Liabilities (if any) within not more than ten (10) days after entry of an order by the Bankruptcy Court approving such transaction;

(f)     discloses (i) the identity of the Potential Bidder and each entity participating in connection with the Potential Bidder and the complete terms of such participation, and (ii) any other term sheets and other written or oral understandings between the Potential Bidder and its affiliates on one hand, and any insider (as defined in section 101(31) of the Bankruptcy Code) of the Debtor, on the other; and

(g)     is received by the Bid Deadline.

*__All bids for a transaction must contemplate payment in cash, in full, upon the closing of the transaction, unless the Debtor agrees otherwise, with the consent of FCC and after consultation with the Committee.__* Any bid that is not for cash, and does not otherwise comply with the above requirements, shall not be deemed to be a Qualified Bid.

Notwithstanding the foregoing, the Debtor shall have the right, in its sole and absolute discretion, after consultation with FCC and the Committee, to entertain bids that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids; *provided, however,* that no bid shall be deemed by the Debtor to be a Qualified Bid unless such bid proposes a transaction that the Debtor determines, in its sole discretion after consultation with FCC and the Committee, has a value in excess of 5% of any Stalking Horse Bid(s) designated by the Debtor by the Stalking Horse Declaration Deadline, plus the assumption of the Assumed Liabilities, taking into account all material terms of any such bid. A Qualified Bid will be valued, among other things, based upon factors such as the net value provided by such bid, the likelihood and timing of consummating such transaction and any other factors that the

Debtor may deem relevant to the transaction. In addition, notwithstanding the foregoing, FCC is entitled to participate in any Auction as a Qualified Bidder pursuant and subject to the terms and provisions set forth below.

The Debtor reserves the right to cancel, and not conduct, the Auction (as defined below) if the Debtor does not receive any Qualified Bids by the Bid Deadline. In such event, the Debtor will file a Notice of No Auction with the Bankruptcy Court, and the previously scheduled Auction will be cancelled.

## Due Diligence

Following execution of a Confidentiality Agreement, the Debtor shall afford each interested party an opportunity to perform due diligence with respect to its business and assets. Due diligence access may include management presentations as may be scheduled by the Debtor, on-site inspections, and such other matters which an interested party may reasonably request and as to which the Debtor, in its sole discretion, may agree. The Debtor shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from interested parties. No due diligence shall continue after the Bid Deadline. The Debtor may, in its discretion, coordinate diligence efforts such that multiple interested parties have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.

Each Qualified Bidder shall be deemed to acknowledge and represent that (i) it has had an opportunity to conduct any and all due diligence regarding GPI's business and assets prior to making its offer, (ii) it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the business and assets in making its bid, (iii) it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business or assets, or the completeness of any information provided in connection therewith, the Bidding Process or the Auction (as defined herein), except, as to any Stalking Horse, as expressly stated in the APA, and as to a Successful Bidder other than a potential Stalking Horse, as expressly stated in the definitive agreement with such Successful Bidder approved by the Bankruptcy Court, and (iv) that it has not engaged and will not engage in collusion in connection with the bidding process at any time.

## Bid Deadline

A Qualified Bidder (other than a potential Stalking Horse and FCC) who desires to make a bid shall deliver written copies of its bid to each of the following, no later than 12:00 Noon Central Time on July 27, 2015 (the "Bid Deadline"):

| Counsel to the Debtor: | Debtor's Investment Banker |
|---|---|
| Gray Reed & McGraw, P.C. | Equity Partners HG LLC |
| 1601 Elm Street, Suite 4600 | 16 N. Washington Street |
| Dallas, Texas 75201 | Easton, Maryland 21601 |
| Attn.: Jason S. Brookner | Attn: Fred Cross and Ken Mann |

{GULFPACK/001/00043062.DOC/}                     5

6862581v2

| | |
|---|---|
| Email: jbrookner@grayreed.com<br><br>-and-<br><br>FrankGecker LLP<br>325 N. LaSalle Street, Suite 625<br>Chicago, Illinois 60654<br>Attn: Joseph D. Frank<br>Email: jfrank@fgllp.com | Email: fcross@equitypartnershg.com<br>kmann@equitypartnershg.com |
| Debtor's Chief Restructuring Officer:<br>Gavin/Solmonese LLC<br>919 N. Market Street, Suite 600<br>Wilmington, Delaware 19801<br>Attn: Ted Gavin, CTP<br>Email: ted.gavin@gavinsolmonese.com | Counsel to FCC:<br>Goldberg Kohn, Ltd.<br>55 East Monroe Street, Suite 3300<br>Chicago, Illinois 60603<br>Attn: Dimitri G. Karczazes<br>Email: dimitri.karczazes@goldbergkohn.com |
| Counsel to the Committee<br>Freeborn & Peters LLP<br>311 S. Wacker Drive, Suite 3000<br>Chicago, IL 60606<br>Attn: Shelly DeRousse and Richard S. Lauter<br>Email: sderousse@freeborn.com<br>rlauter@freeborn.com | |

## Stalking Horse Declaration and Break-Up Fee

Recognizing that potential purchasers will have expenditures of time, energy, and resources, the Debtor may agree, in its sole and absolute discretion after consulting with the Committee, FCC and the United States Trustee, to provide a break-up fee to one or more purchasers (each being a "Stalking Horse"), in an amount not to exceed 2.5% of such purchaser's transaction consideration, as the same will further the goals of the Bidding Procedures by setting a floor which all other Qualified Bids must exceed (the "Break-Up Fee"). The Break-Up Fee shall only be payable if (i) a Stalking Horse, being ready, willing and able to close its transaction, is not the Successful Bidder at the Auction, (ii) the Bankruptcy Court authorizes the Debtor to enter into an alternative transaction, (iii) such alternative transaction actually closes. Payment of the Break-Up Fee shall otherwise be governed by the terms and provisions of the Bidding Procedures Order.

Any bidder wishing to be considered as a Stalking Horse must submit its bid no later than July 10, 2015 (the "Stalking Horse Bid Deadline"). If any bids are received from a potential stalking horse, the Debtor may declare one or more such bids as the Debtor deems appropriate in its business judgment, in consultation with FCC and the Committee, to be the Stalking Horse Bid(s), against which all other bids will be measured. If the Debtor declares

one or more Stalking Horses, it shall file a notice of the same with the Bankruptcy Court no later than July 11, 2015 (the "Stalking Horse Declaration Deadline"), along with a copy of the Stalking Horse Bid(s).

## Auction

If the Debtor receives at least one Qualified Bid, an auction (the "Auction") will be conducted, upon notice to all Qualified Bidders who have submitted Qualified Bids, at 10:00 a.m. (prevailing Central Time) on July 29, 2015, at the offices of Perkins Coie LLP, 131 South Dearborn Street, Suite 1700, Chicago, Illinois 60603, in accordance with the following procedures:

(a) Only of the following persons shall be entitled to attend the Auction: (i) professionals and principals or members of the Debtor, (ii) Equity Partners, (iii) Counsel to FCC, (iv) Counsel to the Committee and its financial advisor, (v) the United States Trustee for the Northern District of Illinois (the "U.S. Trustee"), and (vi) professionals and principals or members of any Qualified Bidder who has timely submitted a Qualified Bid and FCC in its capacity as a Qualified Bidder (collectively, the "Participating Parties"). Only Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

(b) At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtor, FCC, Equity Partners and the Committee whether it intends to participate in the Auction. At the commencement of the Auction, Qualified Bidders in attendance will be informed of which Qualified Bid or combination of Qualified Bids the Debtor believes is the highest or otherwise best offer(s), and from which bidding will begin.

(c) All Participating Parties shall be entitled to be present for all Subsequent Bids (as defined below) with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid shall be fully disclosed to all Participating Parties throughout the entire Auction.

(d) The Debtor may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, and after consulting with FCC and the Committee regarding the same.

(e) Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids as identified by the Debtor at the onset of the Auction (the "Baseline Bid") and continue in minimum increments of at least $10,000.00 (which increments may be increased or decreased by the Debtor, in its sole discretion, in consultation with FCC and the Committee)

higher than the previous bid or bids ("Subsequent Bids"). The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids with full knowledge and written confirmation of the then-existing highest bid or bids.

The Debtor shall maintain a transcript of the proceedings at the Auction, including the Baseline Bid, all Subsequent Bids and the Successful Bid (as defined below).

## Selection Of Successful Bid

At the conclusion of the Auction, or as soon thereafter as practicable, the Debtor, in consultation with FCC and the Committee, shall select the highest or otherwise best Qualified Bid (or Qualified Bids) received at the Auction after taking into account such factors as the Debtor deems pertinent including, but not limited to, facts affecting the speed and certainty of consummating the transaction (the "Successful Bid" and the bidder making such bid, the "Successful Bidder").

The Debtor shall enter into the transaction representing the highest or otherwise best Qualified Bid with the Successful Bidder, upon approval of such Successful Bid by the Bankruptcy Court at a hearing to be conducted at 10:30 a.m. on July 30, 2015 (the "Sale Hearing").

All bidders at the Auction will be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the Sale and the construction and enforcement of any purchase agreement.

## Back-Up Bidder

If there is an Auction, the Qualified Bidder that submits the second highest Bid at the Auction shall be required to serve as the back-up bidder (the "Back-Up Bidder") and keep such Back-Up Bidder's last Bid (the "Back-Up Bid") open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Central Time) on the date which is thirty (30) days after the date of the Sale Hearing, and (ii) the closing of the transaction with the Successful Bidder (the "Outside Back-Up Date"). If, following the Sale Hearing and prior to the Outside Back-Up Date, the Successful Bidder fails to consummate an approved transaction because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to have the new Successful Bid, and the Debtor will be authorized, without further order of the Bankruptcy Court, to consummate the transaction with the Back-Up Bidder. The Debtor will provide notice to the Committee and FCC of any failure by the Successful Bidder to close the transaction and the election to proceed to close a transaction with the Back-Up Bidder.

## Right to Credit Bid

Any creditor that has a valid, perfected and enforceable security interest (a "Security

6862581v2

Interest") in the Debtor's assets (any such creditor, a "Secured Party") shall have the right to make one or more credit bids of all or any portion of the secured claim(s) held by such Secured Party at the Auction to the full extent permitted by section 363(k) of the Bankruptcy Code (a "Credit Bid"). FCC shall be permitted to Credit Bid in an amount up to the amount of its allowed secured claim, pursuant and subject to that certain *Final Order Authorizing Debtor to: (A) Use Cash Collateral on an Emergency Basis; and (B) Grant Adequate Protection and Provide Security and Other Relief to FCC, LLC d/b/a First Capital, as Lender* [Docket No. 153] (the "Cash Collateral Order").

In order to qualify to Credit Bid, a Secured Party must be a Qualified Bidder and a Credit Bid must qualify as a Qualified Bid. FCC is deemed to be a Qualified Bidder.

### The Sale Hearing

The Sale Hearing is currently scheduled to take place before the Honorable Pamela S. Hollis, United States Bankruptcy Judge, on July 30, 2015 at 10:30 a.m. (prevailing Central Time) in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, 219 S. Dearborn Street, Courtroom 644, Chicago, Illinois 60604. The Sale Hearing may be adjourned or rescheduled by the Debtor without notice other than by an announcement made at the Sale Hearing.

The Debtor will not be bound by a Successful Bid or a Back-up Bid unless and until the Bankruptcy Court has approved the same. Following Bankruptcy Court approval of a transaction with the Successful Bidder, if the Successful Bidder fails to consummate the transaction for any reason, then the Back-Up Bidder will be deemed to the Successful Bidder and the Debtor will enter into a transaction with the Back-Up Bidder on the terms of the Back-up Bid without any further Order of the Bankruptcy Court, and the Debtor may pursue any and all available remedies against the Successful Bidder in connection with its failure to consummate the Sale.

The Deposit (together with interest, if any, thereon) of the Back-Up Bidder will not be returned until two (2) business days following the closing of the Sale. The Deposit (together with interest, if any, thereon) of all other Qualified Bidders will be returned within 48 hours of the Auction. The Deposit of the Successful Bidder (together with interest, if any, thereon) shall be applied against the payment of the transaction consideration upon the closing of the transaction. In the event a Bidder fails to close as a result of its own default, its Deposit shall be released to, and retained by, the Debtor.

### Reservation Of Rights

Notwithstanding any term to the contrary herein, the Debtor, in consultation with FCC and the Committee, reserves the right to: (i) modify the Bidding Procedures at any time; (ii) determine which Qualified Bid, if any, is the highest or otherwise best offer; and (iii) reject at any time, any bid that is: (a) inadequate or insufficient (in the Debtor's sole and absolute discretion); (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the APA; or (c) contrary to the best interests of the

Debtor, its estate, and creditors as determined by the Debtor in its sole discretion.

# EXHIBIT "B"

## Asset Purchase Agreement

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is entered into this ____ day of July __, 2015 by and between _____, a _____ ("Buyer"), and Gulf Packaging, Inc., a Texas corporation ("Seller").  Buyer and Seller are each referred to herein individually as a "Party," and collectively as the "Parties."

## RECITALS:

A.      Seller is engaged in the business of distributing packaging equipment and materials (the "Business").

B.      On April 29, 2015, Seller voluntarily commenced a case under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois, which is being administered under Case No. 15-15249 (PSH) (the "Chapter 11 Case").

C.      The Parties desire that Buyer acquire and purchase from Seller, and that Seller sell, convey transfer and assign to Buyer, certain assets of Seller used in the operation of the Business, on the terms and conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the premises and of their mutual covenants and agreements set forth in this Agreement, the Parties do hereby agree as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

1.1      Definitions.

Accounting terms used and not otherwise defined herein shall have the meanings given to them under GAAP.  When used in this Agreement, the following terms in all of their tenses and cases shall have the meanings assigned to them below or elsewhere in this Agreement as indicated below:

"Acquisition Proposal" means a proposal relating to disposition of the Purchased Assets pursuant to one or more transactions.

"Affiliate" of any Person means any Person directly or indirectly controlling, controlled by or under common control with any such Person and any shareholder, officer or director of such Person.

"Agreement" is defined in the Preamble.

"Allocation" is defined in Section 3.3.

"Alternative Transaction" means (a) a transaction contemplated by an Acquisition Proposal from a third party, or (b) a plan of reorganization of Seller not involving the sale of the Purchased Assets to Buyer.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement executed by Buyer and Seller, substantially in the form attached hereto as Exhibit B.

"Bankruptcy Code" means Title 11 of the United States Code, as amended, 11 U.S.C. §§ 101, *et. seq.*

"Bankruptcy Court" means the United States Bankruptcy court for the Northern District of Illinois, or such other court exercising competent jurisdiction over the Chapter 11 Case involving Seller.

"Bid Procedures Order" means the Bankruptcy Court Order (a) Approve Comprehensive Sale Process, (b) Approve Bidding Procedures and Certain Bid Protections, (c) Schedule a Sale Hearing, (d) Approve Form and Manner of Notice Related Thereto, (e) Authorize Sale Free and Clear of All Liens, Claims, Interests and Encumbrances, (f) Authorize Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Proposed Cure Amounts with Respect Thereto and (g) Grant Related Relief, signed on _____, 2015.

"Bill of Sale" means a Bill of Sale executed by Seller, substantially in the form attached hereto as Exhibit A.

"Business" is defined in the Recitals.

"Buyer" is defined in the Preamble.

"Cash Deposit" is defined in Section 3.2(a).

"Chapter 11 Case" is defined in the Recitals.

"Closing" and "Closing Date" are defined in Section 8.1.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Contemplated Transactions" means all of the transactions contemplated by this Agreement.

"Contract" means any written commitment, understanding, instrument, lease, pledge, mortgage, indenture, license, agreement, purchase or sale order, contract, promise or similar arrangement evidencing or creating any legally binding obligation.

"GAAP" means generally accepted accounting principles, as in effect in the United States from time to time and consistently applied.

"Governmental Authority" means any foreign, federal, state, regional or local authority, agency, body, court or instrumentality, regulatory or otherwise, which, in whole or in part, was formed by or operates under the auspices of any foreign, federal, state, regional or local government.

"Law" means any federal, state, regional, local or foreign law, rule, statute, ordinance, rule, Order or regulation.

"Lien" means any lien, charge, covenant, condition, easement, adverse claim, demand, encumbrance, limitation, security interest, option, pledge, or any other title defect or restriction of any kind.

"Order" shall mean any order, judgment, injunction, award, decree or writ of any Governmental Authority.

"Party" and "Parties" are defined in the Preamble.

"Periodic Taxes" is defined in Section 9.3.

"Person" means any individual, corporation, partnership, limited liability company, association or any other entity or organization.

"Proration Periods" is defined in Section 9.3.

"Purchase Price" is defined in Section 3.1.

"Purchased Assets" is defined in Section 2.1.

"Sale Date" means the date that the Sale Order is entered by the Bankruptcy Court.

"Sale Order" means the order of the Bankruptcy Court, in form and substance reasonably satisfactory to Buyer and Seller, to be issued by the Bankruptcy Court pursuant to Sections 363 and 365, and to the extent possible Section 1146(a), of the Bankruptcy Code in a form substantially (a) approving this Agreement and the Contemplated Transactions, (b) approving the sale of the Purchased Assets to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, (c) approving the assumption and assignment to Buyer of any Assumed Liabilities and (d) finding that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

"Seller" is defined in the Preamble.

"Settlement Statement" is defined in Section 3.3.

6864218v2

"Tax" means any tax, charge or assessment by or liability to any Governmental Authority, including, but not limited to, any deficiency, interest or penalty.

"Tax Returns" means any return, report or declaration filed with or submitted to any Governmental Authority in connection with the assessment, collection or payment of any Tax.

"Termination Fee" is defined in Section 8.3(d).

"Transaction Taxes" is defined in Section 9.2.

1.2    Interpretation.  When a reference is made in this Agreement to a Section, Schedule or Exhibit, such reference shall be to a Section, Schedule or Exhibit of this Agreement unless otherwise indicated.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "included," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation."  When used in this Agreement, the word "primarily" shall be deemed to be followed by the phrase "or exclusively."  Unless otherwise indicated, all references to dollars refer to United States dollars.  The Parties acknowledge that both Parties have participated in the drafting and preparation of this Agreement and agree that any rule of construction to the effect that ambiguities are to be construed against the drafting party shall not be applied to the construction or interpretation of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

2.1    Purchased Assets.  Subject to the terms and conditions of this Agreement and pursuant to Section 363 of the Bankruptcy Code, effective as of the Closing, Seller shall sell, convey, transfer, assign and deliver to Buyer, free and clear of all Liens, and Buyer shall purchase, all right, title and interest in and to the assets of Seller described on Schedule 2.1 hereto (collectively, the "Purchased Assets").

2.2    Assumed Contracts.  Subject to the terms and conditions of this Agreement, effective as of the Closing, Seller shall assign all of its rights, and Buyer shall assume all of Seller's obligations, under the contracts listed on Schedule 2.2 hereto (the "Assumed Liabilities").

2.3    Retained Assets.  Notwithstanding anything to the contrary in this Agreement, Seller shall not sell, convey, transfer, assign or deliver, and Buyer shall not purchase or acquire any assets of Seller other than the Purchased Assets.

2.4    Deemed Consents and Cures.  For all purposes of this Agreement (including all representations and warranties of Seller contained herein), Seller shall be deemed to have

{GULFPACK/001/00043064.DOC/}

4

obtained all required consents, as applicable, in respect of the assignment of any Purchased Asset and to have cured all defaults thereunder if, and to the extent that, pursuant to the Sale Order, Seller is authorized to assign any Purchased Assets to Buyer pursuant to Section 365 of the Bankruptcy Code.

ARTICLE III

CONSIDERATION

3.1     Purchase Price.  The total consideration to be paid by Buyer to Seller for the Purchased Assets is (a) $_____ (the "Purchase Price") and (b) the assumption by Buyer of the Assumed Liabilities.  Prior to or on the Closing Date, Buyer and Seller shall jointly conduct a reconciliation of the existence of the Purchased Assets.  To the extent any Purchased Asset is not available to be conveyed to Buyer on the Closing Date, the Purchase Price shall be adjusted pursuant to the procedures set forth on Schedule 3.1; provided, however, that no adjustment shall be made due to the condition of any of the Purchased Assets.  Notwithstanding anything herein to the contrary, in no event shall any adjustment result in the Purchase Price attributable to any category or item of Purchased Assets being zero, or less.

3.2     Payment.  Buyer shall pay the Purchase Price to Seller as follows:

(a)     The cash deposit required by the Bid Procedures Order in the amount of $_____ (the "Cash Deposit") is to be held by Seller against payment of the Purchase Price and as security for the performance by Buyer of its obligations under this Agreement.  The Cash Deposit shall be applied to the Purchase Price as set forth in Section 6.2.4 hereof.

(b)     The Purchase Price, as it may be adjusted, less the Cash Deposit, will be paid at the Closing by wire transfer of immediately available funds.

3.3     Settlement Statement; Allocation of Purchase Price.  Prior to or on the Closing Date, the Parties shall agree upon a settlement statement setting forth the calculation of the Purchase Price as of the Sale Date (the "Settlement Statement").  Prior to or on the Closing Date, the Parties shall agree to the allocation of the appropriate portions of the Purchase Price, Assumed Liabilities and other relevant items among the Purchased Assets, in accordance with Code Section 1060 and the Treasury regulations promulgated thereunder and any comparable provisions of state or local law, as appropriate (the "Allocation"), which Allocation shall be binding upon the Parties and which will be attached to this Agreement as Schedule 3.3.  The Parties and their respective Affiliates shall report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such Allocation.  Each Party shall furnish the other Party with such cooperation and existing information as is reasonably requested by the other Party in connection with the preparation of the Allocation described in this Section 3.3.  The Parties covenant and agree that (a) neither Buyer nor Seller shall assert that this Section 3.3 was not separately bargained for at arm's length and in good faith, and (b) neither Buyer nor Seller will take any position before any

{GULFPACK/001/00043064.DOC/}

5

Governmental Authority, in any judicial proceeding, or in any Tax Return that is in any way inconsistent with such Allocation unless otherwise required by Law.

3.4     Alternative Transaction Provisions.  Seller shall be entitled to consider proposals for Alternative Transactions from third parties consistent with its fiduciary obligations as a debtor in possession in the Chapter 11 Case.

3.5     Risk of Loss.  Notwithstanding anything to the contrary herein, Buyer shall assume all risk of loss with respect to the Purchased Assets and shall become fully obligated with respect to the Assumed Liabilities on and as of the Sale Date.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

4.1     Organization and Power of Seller.  Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Texas.  Seller has requisite corporate power to:  (a) own, lease and operate the Purchased Assets and carry on the Business as and where such assets are now owned or leased and as the Business is presently being conducted; and (b) execute, deliver and perform this Agreement and all other agreements and documents to be executed and delivered by it in connection herewith, subject to and after giving effect to the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code.

4.2     Enforceability.  All requisite corporate action to approve, execute, deliver and perform this Agreement has been taken by Seller.  This Agreement and each other agreement and document delivered by Seller in connection herewith have been duly executed and delivered by Seller, subject to entry of the Sale Order by the Bankruptcy Court, constitute the binding obligation of Seller, enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and other laws affecting creditors' rights generally and by principles of equity.

4.3     No Implied or Other Representations or Warranties. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO THAT SELLER AND ANY OF ITS AFFILIATES ARE NOT MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY GIVEN IN THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OR REPRESENTATION AS TO CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO ANY OF THE ASSETS, AND IT IS UNDERSTOOD THAT EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, BUYER TAKES ALL OF SUCH PROPERTIES AND ASSETS ON AN "AS IS" AND "WHERE IS" BASIS.

{GULFPACK/001/00043064.DOC/}

6864218v2

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1     Organization and Power.  Buyer is a _____ duly organized, validly existing and in good standing under the laws of the State of _____.  Buyer has full power to execute, deliver and perform this Agreement and all other agreements and documents to be executed and delivered by it in connection herewith.

5.2     Enforceability.  All requisite action to approve, execute, deliver and perform this Agreement and each other agreement and document delivered by Buyer in connection herewith has been taken by Buyer.  This Agreement and each other agreement and document delivered by Buyer in connection herewith have been duly executed and delivered by Buyer and constitute the binding obligations of Buyer enforceable in accordance with their respective terms.

5.3     Consents.  Except for the approval of the Bankruptcy Court, no approval or consent of, or filing with, any Person or Governmental Authority is required in connection with the transactions contemplated hereby or the execution, delivery or performance by Buyer of this Agreement or any other agreement or document delivered by or on behalf of Buyer in connection herewith.

5.4     No Conflicts.  No action taken by or on behalf of Buyer in connection herewith, including, but not limited to, the execution, delivery and performance of this Agreement, and each other agreement and document delivered by it in connection herewith, and consummation of the Contemplated Transactions, (a) gives rise to a right of termination or acceleration under any Contract to which Buyer is a party or by which Buyer is bound; (b) conflicts with or violates (i) any Law; (ii) Buyer's organizational documents; or (iii) any Order to which Buyer is subject; or (c) constitutes an event which, after notice or lapse of time or both, could result in any of the foregoing.

5.5     Litigation.  Except for the required approval of the Bankruptcy Court to the consummation of the Contemplated Transactions, no litigation or administrative proceeding is pending, or to the knowledge of Buyer, threatened against Buyer which could prevent Buyer from entering into, or performing its obligations under, this Agreement.

5.6     Brokers or Finders.  Except as set forth on Schedule 5.6, no Person is or will become entitled, by reason of any agreement or arrangement entered into or made by or on behalf of Buyer to receive any commission, brokerage, finder's fee or other similar compensation arrangement in connection with the consummation of the Contemplated Transactions.

5.7     Financing.  Buyer has adequate financing from internally-generated sources and has adequate cash on hand, or will obtain adequate financing on or prior to the Sale Date, and

{GULFPACK/001/00043064.DOC/}

7

6864218v2

will continue to have adequate financing on the Closing Date, to enable it to fulfill its obligations under this Agreement. Buyer acknowledges and agrees that Buyer's obligations under this agreement are not contingent on obtaining adequate financing.

5.8    Buyer's Investigation.    Buyer represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial advisors and hereby acknowledges that it has conducted an investigation of the Purchased Assets. Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges that it is accepting the Purchased Assets in their present condition and locations and with their present operating capabilities. Buyer acknowledges that Seller make no warranty, express or implied, as to the condition of the Purchased Assets except as expressly set forth in this Agreement. Buyer has not relied upon, and Seller shall not be liable for or bound in any manner by, any express or implied verbal or written information, warranties, guarantees, promises, statements, inducements, representations or opinions pertaining to the Business or the Purchased Assets, except as may be contained in this Agreement. Buyer has inspected, or waived its right to inspect, the Purchased Assets for all purposes and satisfied itself as to their condition. Buyer is relying solely upon its own inspection of the Purchased Assets, and Buyer shall accept all of the same in their as is, where is, condition. Buyer acknowledges that the representations and warranties of Seller contained in this Agreement constitute the sole and exclusive representations and warranties of Seller to Buyer in connection with this Agreement and the Contemplated Transactions, and Buyer acknowledges that all other representations and warranties are specifically disclaimed and may not be relied upon or serve as a basis for a claim against Seller or its Affiliates.

ARTICLE VI

CONDITIONS TO CLOSING

6.1    Conditions to Buyer's Obligations.    The obligation of Buyer to consummate the Contemplated Transactions on the Closing Date is subject to the fulfillment on or prior to the Sale Date of the following conditions, any one or more of which may be waived by Buyer:

6.1.1    Representations and Covenants.    Each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects on and as of the Sale Date with the same effect as though made on the Sale Date. Seller shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Sale Date. Seller shall have delivered to Buyer a certificate, dated the Sale Date and signed by an authorized officer of Seller, to the foregoing effect and stating that all conditions to Buyer's obligations hereunder, to the extent required to be performed by Seller, have been satisfied or waived.

6.1.2    No Orders.    On the Sale Date, there shall be no Order of any nature which directs that the Contemplated Transactions, in whole or in part, not be consummated.

6.1.3    <u>Bankruptcy Court Approval</u>.  The Sale Order shall have been entered by the Bankruptcy Court, and such order shall be in form and substance reasonably satisfactory to Buyer.  At a minimum, the Sale Order shall (a) provide that the Purchased Assets are being sold to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, and (b) find that Buyer is a good faith purchaser entitled to the protection of Section 363(m) of the Bankruptcy Code.

6.1.4    <u>Closing Deliveries</u>. Seller shall have delivered, or caused to be delivered, to Buyer the following documents, duly executed by Seller (where appropriate):

(a)    <u>Transfer Instruments</u>.  The Bill of Sale, the Assignment and Assumption Agreement, and such other transfer instruments in form and substance reasonably satisfactory to Buyer and signed by Seller, as shall be required to enable Buyer to acquire the Purchased Assets and cause Buyer to assume the Assumed Liabilities;

(b)    <u>Officer's Certificate</u>.  The officer's certificates contemplated by Section 6.1.1;

(c)    <u>Sale Order</u>.  A copy of the Sale Order;

(d)    <u>Settlement Statement</u>.  A copy of the Settlement Statement; and

(e)    <u>Other</u>.  Such other document(s) or instruments required to be delivered by Seller to Buyer hereunder.

6.2    <u>Conditions to Seller' Obligations</u>.  The obligation of Seller to consummate the Contemplated Transactions on the Closing Date is subject to the fulfillment on or prior to the Sale Date of the following conditions, any one or more of which may be waived by Seller:

6.2.1    <u>Representations and Covenants</u>.    Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Sale Date with the same effect as though made on the Sale Date.  Buyer shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Sale Date.  Buyer shall have delivered to Seller a certificate, dated the Sale Date and signed by an authorized officer of Buyer, to the foregoing effect and stating that all conditions to Seller's obligations hereunder, to the extent required to be performed by Buyer, have been satisfied or waived.

6.2.2    <u>No Orders</u>.  On the Sale Date, there shall be no Order of any nature which directs that the Contemplated Transactions, in whole or in part, not be consummated.

6.2.3    <u>Bankruptcy Court Approval</u>.  The Sale Order shall have been entered by the Bankruptcy Court, and such order shall be in form and substance reasonably satisfactory to Buyer and Seller.  At a minimum, the Sale Order shall (a) provide that the Purchased Assets are

{GULFPACK/001/00043064.DOC/}

9

being sold to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, and (b) find that Buyer is a good faith purchaser entitled to the protection of Section 363(m) of the Bankruptcy Code.

      6.2.4   <u>Purchase Price</u>.  Buyer shall have delivered the Purchase Price to Seller as specified in Article III.  The Cash Deposit shall be applied to such amount at Closing.

      6.2.5   <u>Closing Deliveries</u>.  Buyer shall have delivered to, or caused to be delivered, to Seller the following documents, duly executed by Buyer (where appropriate):

      (a)   <u>Officer's Certificate</u>.  The officer's certificate contemplated by Section 6.2.1;

      (b)   <u>Assignment and Assumption Agreement</u>.   The Assignment and Assumption Agreement; and

      (c)   <u>Other</u>.  Each other document required to be delivered by Buyer to Seller hereunder.

ARTICLE VII

<u>COVENANTS</u>

      7.1   <u>Effectiveness of Representations and Warranties</u>.  Subject to the restrictions set forth in the Bankruptcy Code or Orders of the Bankruptcy Court, from the date hereof through the Sale Date, Seller shall use its reasonable efforts to conduct the Business in such a manner so that the representations and warranties contained in Article IV shall continue to be true and correct on and as of the Sale Date as if made on and as of the Sale Date.

      7.2   <u>Conduct of Business</u>.  Except to the extent required by the Bankruptcy Court, Seller shall not, with respect to the Business, except as otherwise permitted by the Bankruptcy Code or an Order of the Bankruptcy Court:

      (a)   permit any of the Purchased Assets to be subjected to any additional Lien, other than Liens that will be released as of the Closing; or

      (b)   sell or dispose of any Purchased Assets other in the ordinary course of the operation of the Business.

      7.3   <u>Access</u>.  From the date hereof until the Closing Date, Seller shall provide Buyer and its representatives reasonable access during normal business hours to Seller's personnel, facilities and all books and records and such other information and Persons relating to the Business as Buyer may reasonably request.

7.4     Bankruptcy Filings.  From the date hereof until the Closing Date, Seller shall promptly deliver to Buyer's counsel copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers which relate to or may affect this Agreement or the Purchased Assets that Seller files in the Chapter 11 Case.

7.5     Publicity.  Copies of the text of all public announcements (whether pre-Closing or post-Closing) relating to this Agreement or the Contemplated Transactions will be provided to the other Party prior to public release of the disclosure to be made.

7.6     Expenses.  Except to the extent otherwise specifically provided in this Agreement, each Party shall bear its respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel and accountants.  Buyer shall be solely responsible for all fees and expenses incurred or otherwise payable to all Persons listed on Schedule 5.6.

7.7     Further Assurances.

7.7.1     Seller agrees that, at any time and from time to time after the Closing, it will, upon the request of Buyer, do all such further acts as may be reasonably required to further transfer and assign to Buyer any of the Purchased Assets, or to vest in Buyer good and marketable title to the Purchased Assets.

7.7.2     Buyer agrees that, at any time and from time to time after the Closing, it will, upon the request of Seller, do all such further acts as may be reasonably required to cause Buyer to assume the Assumed Liabilities in accordance with this Agreement and as may otherwise be appropriate to carry out the transactions contemplated by this Agreement.

7.8     Accounts Receivable.  Except to the extent such account receivable constitutes part of the Purchased Assets, if Buyer receives a payment from an account debtor for which there is an outstanding account receivable both before and after the Sale Date, such payment shall be applied to the oldest outstanding invoice(s), the payment of which the account debtor is not disputing.  In the event a customer claims that it is disputing an account receivable, Buyer agrees:  (a) to promptly inform Seller of such dispute and forward to Seller any information or documents it has in connection therewith; and (b) to cooperate reasonably with Seller in its efforts to resolve such dispute in such manner as Seller shall reasonably request in light of Seller's goal to collect the disputed receivables.  On the 30th day after the Sale Date, and each 30th day thereafter, Buyer shall deliver to Seller all payments collected from each account debtor with respect to the accounts receivable of Seller, along with all documentation with respect thereto that Seller reasonably requests.

7.9     Vehicles.  Buyer agrees to use its commercially reasonable efforts to file promptly the appropriate vehicle title applications and registrations to change the name of the titled owner on each vehicle title certificate and change the motor vehicle registration (with respect to license plate information) on each vehicle being transferred to Buyer from Seller pursuant to this

{GULFPACK/001/00043064.DOC/}

11

6864218v2

Agreement. Buyer agrees that it shall remove and destroy Seller's existing license plates from all vehicles received upon the earlier of receipt of new license plates or 60 days following Closing.

ARTICLE VIII

CLOSING AND TERMINATION

8.1     Closing.  The closing (the "Closing") of the Contemplated Transactions shall be held on or within fifteen days after the Sale Date (or such other date as the Parties may agree in writing), at the offices of Gray Reed & McGraw, PC, 1601 Elm Street, Dallas, Texas 75201, at 10:00 a.m., Dallas, Texas time.  The date on which the Closing occurs is referred to as the "Closing Date."  The transfers and deliveries described in Article VI shall be mutually interdependent and regarded as occurring simultaneously, and no such transfer or delivery shall become effective until all the other transfers and deliveries provided for in Article VI have also been made.  Seller and Buyer shall meet on the date preceding the Closing Date at the offices of Gray Reed & McGraw, PC to conduct a pre-Closing at which all deliveries to be made at Closing will be reviewed by the parties and placed in escrow.  At 10:00 a.m. Dallas, Texas time, on the Closing Date, or as soon thereafter as is practicable, all instruments and payments shall be distributed and disbursed to Seller and Buyer, and the Closing shall be consummated.

8.2     Termination.  This Agreement and the Contemplated Transactions may not be terminated except as follows:

 (a)     Upon the mutual written consent of Seller and Buyer;

 (b)     By Seller, if (i) Buyer is in material breach of this Agreement and (ii) such breach has not been cured on or before the Closing Date;

 (c)     By Buyer, if (i) Seller is in material breach of this Agreement and (ii) such breach has not been cured on or before the Closing Date;

 (d)     By Seller, if the Closing has not occurred on or before _____, 2015;

 (e)     By Seller, if Seller enters into and consummates an Alternative Transaction pursuant to a sale order comparable to the Sale Order or if Seller, pursuant to such a sale order, agrees or determines to enter into an Alternative Transaction; or

 (f)     By either Seller or Buyer, if there shall be in effect a final non-appealable court order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

8.3     Effect of Termination.

(a)     Upon the termination of this Agreement in accordance with Section 8.2 hereof, and except as set forth in Section 8.3(d) below, the Parties shall be relieved of any further obligations or liability under this Agreement other than obligations or liabilities in accordance with (i) the expense allocation provisions under Section 7.6, (ii) the jurisdiction provisions of Section 10.7 and (iii) obligations for breaches of this Agreement occurring prior to such termination.

(b)     Upon any termination pursuant to Sections 8.2(b) or 8.2(d), Seller shall be entitled to retain the Cash Deposit as liquidated damages for expenses incurred in connection with this Agreement.  The release of the Cash Deposit to Seller shall be the sole and exclusive remedy available to Seller upon such a termination.

(c)     Upon any termination pursuant to Sections 8.2(a), 8.2(c), 8.2(e), or 8.2(f), Seller shall return the Cash Deposit to Buyer.

(d)     Upon any termination pursuant to Section 8.2(e), in addition to the return of the Cash Deposit, Seller shall pay to Buyer a fee equal to two and one-half percent (2.5%) of the Purchase Price (the "Termination Fee").  The Termination Fee shall be payable in immediately available funds by wire transfer no later than five (5) days after such termination.  Notwithstanding anything to the contrary in this Agreement, Buyer's right to receive the return of the Cash Deposit, plus payment of the Termination Fee shall be the sole and exclusive remedy of Buyer and its Affiliates against Seller or any of its Affiliates for any and all losses that may be suffered based upon, resulting from or arising out of such termination, and upon return of the Cash Deposit and payment of the Termination Fee, none of Seller or any of its Affiliates shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated by this Agreement.

(e)     Notwithstanding anything to the contrary contained herein, the provisions of this Section 8.3 and Article VIII shall survive any termination of this Agreement.

ARTICLE IX

TAX MATTERS

9.1     Filing of Returns.  In connection with the preparation and filing of Tax Returns as of and after the Sale Date, Buyer and Seller shall cooperate and exchange information as reasonably required to accomplish the matters contemplated by this Article IX.

9.2     Transaction Taxes.  Buyer shall bear and be responsible for paying any sales, use, stamp, transfer, documentary, registration, business and occupation and other similar taxes (including related penalties (civil or criminal), additions to tax and interest) imposed by any Governmental Authority with respect to the transfer of the Purchased Assets to Buyer ("Transaction Taxes"), regardless of whether any Tax authority seeks to collect such taxes from

{GULFPACK/001/00043064.DOC/}

Seller or Buyer.  Buyer shall also be responsible for (a) administering the payment of such Transaction Taxes, (b) defending or pursuing any proceedings related thereto, and (c) paying any expenses related thereto.  Seller shall give prompt written notice to Buyer of any proposed adjustment or assessment of any Transaction Taxes with respect to the transactions contemplated hereby.  In any proceedings, whether formal or informal, Seller shall permit Buyer to participate and control the defense of such proceeding with respect to such Transaction Taxes, and shall take all actions and execute all documents required to allow such participation, so long as Buyer is diligently pursuing the resolution thereof.

9.3    Tax Prorations.  As to any Purchased Assets acquired by Buyer, Seller and Buyer shall apportion the liability for property taxes and ad valorem taxes ("Periodic Taxes") for all Tax periods including but not beginning or ending on the Sale Date (the "Proration Periods").  The Periodic Taxes described in this Section 9.3 shall be apportioned between Seller and Buyer as of the Sale Date, with Buyer liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Proration Period multiplied by a fraction, the numerator of which is the number of days remaining in the Proration Period including and after the Sale Date, and the denominator of which is the total number of days covered by such Proration Period.  Seller shall be liable for that portion of the Periodic Taxes for the Proration Period for which Buyer is not liable under the preceding sentence.  Buyer and Seller shall pay or be reimbursed for property taxes (including instances in which such property taxes have been paid before the Sale Date) on this prorated basis.  If a payment on a tax bill is due after the Closing, the Party that is legally required to make such payment shall make such payment and promptly forward an invoice to the other Party for its pro rata share, if any.  If the other Party does not pay the invoice within 30 calendar days of receipt, the amount of such payment shall bear interest at the rate of 6% per annum.  The Party responsible for paying a tax described in this Section 9.3 shall be responsible for administering the payment of (and any reimbursement for) such Tax.  For purposes of this Section 9.3, the Proration Period for ad valorem taxes and property taxes shall be the fiscal period for which such taxes were assessed by the relevant Tax jurisdiction.

9.4    Tax Refunds.  Any Tax refunds (including any interest related thereto) received by Buyer, its Affiliates or successors relating to the Purchased Assets and to Tax periods or portions thereof ending on or before the Sale Date shall be for the account of Seller, and Buyer shall pay over to Seller any such amount within five days of receipt thereof.  Buyer shall, if Seller so requests and at Seller's direction and expense, file or cause its Affiliates to file for and obtain any Tax refunds with respect to the Purchased Assets and to Tax periods or portions thereof ending on or before the Sale Date.

ARTICLE X

MISCELLANEOUS CONSTRUCTION

10.1    Notices:

All notices shall be in writing delivered as follows:

(a)    If to Buyer, to:

_____
_____
_____
_____
Attn: _____
Facsimile:_____

With a copy to:

_____
_____
_____
_____
Attn: _____
Facsimile:_____

(b)    If to Seller, to:

Gulf Packaging, Inc.
c/o Gavin/Solmonese LLC
919 N. Market Street, Suite 600
Wilmington, DE 19801
Attn: Ted Gavin
Facsimile: _____
Email: ted.gavin@gavinsolmonese.com

With a copy to:

Gray Reed & McGraw, PC
1601 Elm Street, Suite 4600
Dallas, TX 75201
Attn:  Jason S. Brookner
Facsimile: (214) 953-1332
Email: jbrookner@grayreed.com

6864218v2

or to such other address as may have been designated in a prior notice. Notices sent by registered or certified mail, postage prepaid, return receipt requested, shall be deemed to have been given two business days after being mailed; notices sent by a nationally recognized commercial overnight carrier shall be effective the next business day after receipted delivery to such courier specifying overnight delivery; notices sent by facsimile shall be effective upon confirmation of receipt at the number specified above; notices sent by e-mail shall be effective upon receipt confirmation to the address specified; otherwise, notices shall be deemed to have been given when received at the address specified above (or other address specified in accordance with the foregoing).

10.2   Survival of Representations, Warranties, Covenants and Agreements.   All representations and warranties made by Seller in this Agreement shall terminate on the Closing Date upon the purchase of the Purchased Assets by Buyer, and Seller shall have no liability after the Closing Date for any breach of any representation or warranty.   Except as specifically set forth otherwise in the Agreement, all covenants and agreements of Seller shall lapse at, and be of no further force and effect following, the Closing.

10.3   Binding Effect.   Except as may be otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including, without limitation, any trustee, responsible person, estate administrator, representative or similar Person appointed for or in connection with the Chapter 11 Case or in any subsequent case under the Bankruptcy Code in which any Seller is a debtor. Except as otherwise provided in this Agreement, nothing in this Agreement is intended or shall be construed to confer on any Person other than the Parties any rights or benefits hereunder; provided, however, that the senior secured lender to Seller is and will be an intended third-party beneficiary of this Agreement for the sole purpose of enforcing the obligations of Purchaser hereunder.

10.4   Headings.   The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

10.5   Exhibits and Schedules.   The Exhibits and Schedules referred to in this Agreement shall be deemed to be an integral part of this Agreement.

10.6   Counterparts.   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document.

10.7   Governing Law.   Except to the extent inconsistent with the Bankruptcy Code (in which case the Bankruptcy Code shall govern), this Agreement shall be governed by and construed under Texas law, without regard to conflict of laws principles.

10.8   Waivers.   Compliance with the provision of this Agreement may be waived only by a written instrument specifically referring to this Agreement and signed by the Party waiving compliance.   No course of dealing, nor any failure or delay in exercising any right, shall be

{GULFPACK/001/00043064.DOC/}

16

6864218v2

construed as a waiver, and no single or partial exercise of a right shall preclude any other or further exercise of that or any other right.

10.9   <u>Pronouns</u>. The use of a particular pronoun herein shall not be restrictive as to gender or number but shall be interpreted in all cases as the context may require.

10.10   <u>Modification</u>.   No supplement, modification or amendment of this Agreement shall be binding unless made in a written instrument which is signed by the Parties and which specifically refers to this Agreement.

10.11   <u>Assignment</u>.   No assignment by any Party of this Agreement or any right or obligation hereunder may be made without the prior written consent of the other Party, and any assignment attempted without such consent will be void *ab initio*.

10.12   <u>Entire Agreement</u>.   This Agreement and the agreements and documents referred to in this Agreement or delivered hereunder is the exclusive statement of the agreement among the Parties concerning the subject matter hereof.  All negotiations among the Parties are merged into this Agreement, and there are no representations, warranties, covenants, understandings or agreements, oral or otherwise, in relation thereto among the Parties other than those incorporated herein and to be delivered hereunder.

10.13   <u>Severability</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, the legality, validity, and enforceability of the remaining provisions of this Agreement shall not be affected thereby, and in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be legal, valid, and enforceable.

*[Remainder of page intentionally left blank.]*

{GULFPACK/001/00043064.DOC/}

17

6864218v2

INTENDING TO BE LEGALLY BOUND, the Parties have signed this Agreement as of the date first above written.

**BUYER:**

_____

By: _____

Name:_____

Title:_____

**SELLER:**

GULF PACKAGING, INC.
a Texas corporation

By: _____

Name:_____

Title:_____

6864218v2

INDEX OF SCHEDULES

Schedule 2.1 - Purchased Assets
Schedule 2.2 - Assumed Liabilities
Schedule 3.1 - Purchase Price Adjustment
Schedule 4.3 - Allocation
Schedule 6.6 - Brokers or Finders

INDEX OF EXHIBITS

Exhibit A         Bill of Sale
Exhibit B         Assignment and Assumption Agreement

## Schedule 2.1

## <u>Purchased Assets</u>

**Schedule 2.2**

**<u>Assumed Liabilities</u>**

**Schedule 3.1**

**Purchase Price Adjustment**

To the extent that Schedule 2.1 contains an itemized list of categories of Purchased Assets, including, (a) minimum quantities per category desired to be purchased and (b) a price per category or per unit, then the Purchase Price shall be adjusted on a per unit basis, to the extent the quantity in any category available to be conveyed to Buyer on the Closing Date is less than the minimum quantity specified on Schedule 2.1.

To the extent that Schedule 2.1 does not contain an itemized list of categories of Purchased Assets, including minimum quantities and a price per category or unit, then the Purchase Price shall be adjusted on a pro rata basis, to the extent the quantity in any category available to be conveyed to Buyer on the Closing Date is less than the quantity specified in the **[document being provided to Buyers]** (the "Asset List"). For purposes of calculating the adjustment, the aggregate Purchase Price per category shall be deemed to equal (a) the book value of all Purchased Assets as specified in the Asset List, divided by the aggregate Purchase Price for all Purchased Assets, prior to adjustment, multiplied by (b) the book value of the Purchased Assets included in such asset category as specified in the Asset List.

**Schedule 4.3**

**<u>Allocation</u>**

**Schedule 6.6**

**Brokers or Finders**

## Exhibit A

### Bill of Sale

This Bill of Sale (the "Bill of Sale") is made and entered into by and between Gulf Packaging, Inc., a Texas corporation ("Seller"), and _____, a _____ ("Buyer").

## WITNESSETH:

WHEREAS, pursuant to that certain Asset Purchase Agreement dated July ___, 2015 (the "Agreement") by and between Seller and Buyer, Seller is conveying to Buyer all rights, title and interests of Seller in and to any and all Purchased Assets (as such term is defined in the Agreement) and as further described on Exhibit A.

NOW, THEREFORE, in consideration of the mutual promises contained in the Agreement, the receipt and sufficiency of which are hereby acknowledged and confessed by Seller, effective as of 12:01 a.m. on the Sale Date (the "Effective Time"), Seller does hereby ASSIGN, TRANSFER, SET OVER, CONVEY, and DELIVER to Buyer, its successors and assigns, all of its rights, title, and interests in and to the Purchased Assets.

TO HAVE AND TO HOLD the Purchased Assets unto Buyer, its successors and assigns, forever, free and clear of all liens, security interests and encumbrances, so that neither Seller, its successors or assigns or any third parties shall have, claim or demand any right or title thereto as of the Effective Time.

Seller and Buyer may execute this Bill of Sale in any number of counterparts, separately or together.

Except as provided in the Agreement, this is the final and exclusive expression of the agreement of Seller and Buyer as to the subject matter hereof, and no course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any term expressed in this Bill of Sale. In the event of a conflict between the terms of this Bill of Sale and the Agreement, the Agreement shall control. Capitalized terms used in this Bill of Sale shall, unless defined herein, have the meanings given to such terms in the Agreement.

*[ Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, Seller and Buyer have executed this Bill of Sale to be effective as of the Effective Time.

**SELLER:**

GULF PACKAGING, INC.
a Texas corporation

By: _____
Name:_____
Title:_____

**BUYER:**

_____

By: _____
Name:_____
Title:_____

**Exhibit B**

**Assignment and Assumption Agreement**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated _____
_____, 2015, is between Gulf Packaging, Inc., a Texas Corporation ("Assignor"), and
_____, a _____ ("Assignee").   Assignor and Assignee are sometimes
collectively referred to as the "Parties" and individually referred to as a "Party".

WHEREAS, pursuant to that certain Asset Purchase Agreement dated July ___, 2015 (the
"Purchase Agreement") by and between Assignor and Assignee, Assignor desires to assign its
rights, and Assignee desires to assume Assignor's obligations, under the contracts listed or
described on Exhibit A hereto (the "Assumed Liabilities") pursuant to the terms hereof.

NOW, THEREFORE, in consideration of the foregoing, the covenants and agreements
contained herein, and other good and valuable consideration, the receipt and sufficiency of which
are hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree
as follows:

1.      Effective Time.  This Agreement and the assignment and assumption provided for
in this Agreement shall be effective at 12:01 a.m. on the Sale Date (the "Effective Time").

2.      Assignment by Assignor.  As of the Effective Time, Assignor hereby transfers,
assigns, conveys and delivers to Assignee, all of its rights under contracts listed on Exhibit A.

3.      Assumption by Assignee.  Assignee hereby fully and completely assumes and
agrees to perform all of the duties, liabilities, and obligations of Assignor arising from and after
the Effective Time.

4.      Counterparts; Further Assurances.  The Parties may execute this Agreement in
any number of counterparts, separately or together.  The Parties shall from time to time execute
and deliver to each other such other documents, in form and substance satisfactory to the other,
as may be necessary or appropriate to more fully accomplish the assignment and assumption
contemplated hereby.

5.      Severability.  If any provision of this Agreement is held to be illegal, invalid, or
unenforceable, such provision shall be fully severable and this Agreement shall be construed and
enforced as if such illegal, invalid, or unenforceable provision never comprised a part hereof; the
remaining provisions hereof shall remain in full force and effect and shall not be affected by the
illegal, invalid, or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of
such illegal, invalid, or unenforceable provision, there shall be added automatically as part of this
Agreement a provision as similar in its terms to such illegal, invalid, or unenforceable provision
as may be possible and be legal, valid, and enforceable.

6.     <u>Entire Agreement, Etc.</u>  This Agreement and the Purchase Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof.  In the event of a conflict between the terms of this Agreement and the Purchase Agreement, the Purchase Agreement shall control. Capitalized terms used in this Agreement shall, unless defined herein, have the meaning given to such terms in the Purchase Agreement.

7.     <u>Governing Law; Venue</u>.  This Agreement and the rights and obligations of the Parties shall be governed by, construed, and enforced in accordance with laws of Texas.

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement to be effective as of the Effective Time.

**ASSIGNOR:**

GULF PACKAGING, INC.
a Texas corporation


By: _____
Name:_____
Title:_____


**ASSIGNEE:**

_____


By: _____
Name:_____
Title:_____

# EXHIBIT "C"

## Sale Notice

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GULF PACKAGING, INC.,[1] | ) | Case No. 15-15249 (PSH) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

### NOTICE OF (I) AUCTION
### AND (II) HEARING TO APPROVE AUCTION RESULTS

**PLEASE TAKE NOTICE THAT**, pursuant to an Order of the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court"), dated June 30, 2015 [Docket No. _____ ] (the "Bidding Procedures Order"), Gulf Packaging, Inc., the above-captioned debtor and debtor in possession (the "Debtor") is offering for sale its business as a going concern or certain (or all) of its assets (a "Transaction").

**PLEASE TAKE FURTHER NOTICE THAT**, all interested parties are invited to make competing offers to enter into a Transaction in accordance with the terms and conditions set forth in the Bidding Procedures Order (the "Bidding Procedures"). A Qualified Bidder (other than the Stalking Horse (if any) and FCC, in its capacity as a Qualified Bidder) who desires to make a bid for a Transaction must deliver written copies of its bid as well as all other documents and information required pursuant to the Bidding Procedures to: Gray, Reed & McGraw, P.C., 1601 Elm Street, Suite 4600, Dallas, Texas 75201 (Attn: Jason S. Brookner); FrankGecker LLP, 325 N. LaSalle Street, Suite 625, Chicago, Illinois 60654 (Attn: Joseph D. Frank); Gavin/Solmonese LLC, 919 N. Market Street, Suite 600, Wilmington, Delaware 19801 (Attn: Ted Gavin); Equity Partners HG LLC, 16 N. Washington Street, Easton, Maryland 21601 (Attn: Fred Cross and Ken

---

[1] The last four digits of the Debtor's tax identification number are 5030.

{GULFPACK/001/00043065.DOCX/}

6863058v2

Mann); and Goldberg Kohn, Ltd., 55 East Monroe Street, Suite 3300 Chicago, Illinois 60603 (Attn: Dimitri G. Karcazes), so as to be actually received not later than 12:00 noon (prevailing Central Time) on July 27, 2015 (the "Bid Deadline"). **Pursuant to the Bidding Procedures, if the Debtor receives at least one Qualified Bid prior to the Bid Deadline, an auction for (the "Auction") will be conducted, beginning at 10:00 a.m. (prevailing Central Time), on July 29, 2015 at the offices of Perkins Coie, LLP, 131 South Dearborn Street, Suite 1700, Chicago, Illinois 60603.**

**PLEASE TAKE FURTHER NOTICE THAT,** as set forth in the Bidding Procedures Order, a hearing (the "Sale Hearing") to approve the entry into a Transaction with a Stalking Horse (or to the Successful Bidder submitting a higher or otherwise better bid) will be held on July 30, 2015 at 10:30 a.m. (prevailing Central Time) in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, Dirksen Federal Building, 219 South Dearborn Street, Room No. 644, Chicago, Illinois 60604, before the Honorable Pamela S. Hollis, United States Bankruptcy Judge. The Sale Hearing may be adjourned from time to time without notice other than an announcement made at the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE THAT,** pursuant to the Bidding Procedures Order, enclosed herewith are copies of: (1) the Debtor's Motion for Orders Pursuant to 11 U.S.C. §§ 363 and 365 and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (A) approving comprehensive sale process (B) approving the Bidding Procedures and certain bid protections, (C) scheduling an Auction and Sale Hearing and (D) authorizing and approving (i) the Sale of the Debtor's business as a going concern or certain (or all) of its assets, free and clear of liens, claims, interests and encumbrances, (ii) the assumption and assignment of executory contracts and unexpired leases of the Debtor as may be requested by the Stalking

Horse (if any) or the Successful Bidder (collectively, the "Assumed Contracts") and the proposed

cure amounts with respect thereto, (iii) assumption of certain liabilities (the "Assumed

Liabilities") and (E) granting related relief [Docket No. ___]; (2) the Bidding Procedures Order,

(3) the Bidding Procedures; and (4) the APA.

     **PLEASE TAKE FURTHER NOTICE THAT** objections to entry into a Transaction, if

any, must be in writing and served upon the following so as to be actually received no later than

July 23, 2015: (a) counsel to the Debtor, Gray Reed & McGraw, P.C., 1601 Elm Street, Suite

4600, Dallas, TX 75201 (Attn: Jason S. Brookner), and FrankGecker LLP, 325 N. LaSalle Street,

Suite 625, Chicago, Illinois 60654 (Attn: Joseph Frank); (b) counsel to the Committee, Freeborn

& Peters, LLC, 311 South Wacker Drive, Suite 3000, Dallas, Texas (Attn: Shelly DeRousse); (c)

the Office of the U.S. Trustee, 219 S. Dearborn Street, Room 873 Chicago, Illinois 60604 (Attn:

Katy Gleason); and (d) counsel to FCC, Goldberg Kohn, Ltd., 55 East Monroe Street, Suite

3300, Chicago, Illinois 60603 (Attn: Dimitri G. Karcazes).  If no objections to the Transaction

are timely filed and served, the Court may enter an order approving the sale without any further

notice.

     Respectfully submitted this ___ day of June, 2015.

          **FRANK GECKER LLP**

          */s/ Joseph D. Frank*
           Joseph D. Frank
           Jeremy C. Kleinman
          325 N. LaSalle Street, Suite 625
          Chicago, Illinois 60654
          Telephone: (312) 276-1400
          Facsimile:  (312) 276-0035
          Email:  jfrank@fgllp.com
               jkleinman@fgllp.com

          -and-

GRAY REED & McGRAW, P.C.
Jason S. Brookner (pro hac vice)
Micheal W. Bishop (pro hac vice)
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email: jbrookner@grayreed.com
       mbishop@grayreed.com

**COUNSEL TO THE DEBTOR**